258 N.J. Super. 451 (1992)
610 A.2d 403
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
MARKO BEY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 13, 1992.
Decided May 26, 1992.
*452 Before Judges KING, GRUCCIO and BROCHIN.
James K. Smith, Jr., Deputy Public Defender, argued the cause for appellant (Wilfredo Caraballo, Public Defender of New Jersey, attorney).
*453 Catherine A. Foddai, Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by KING, P.J.A.D.
This appeal involves the admissibility of incriminating statements made to a State prison guard by defendant while under a sentence of death. At a retrial after reversal of his capital conviction, defendant claimed that his statements to the guard while he was on death row and his case was on appeal were inadmissible because the State had violated his right to counsel. We disagree with this contention.
This appeal arises from the conviction of defendant, Marko Bey, for the aggravated sexual assault and murder of Cheryl Alston on April 2, 1983 after a retrial in Monmouth County. The Supreme Court had earlier reversed defendant's conviction and death sentence in the first trial for the same Alston murder, State v. Bey I, 112 N.J. 45, 548 A.2d 846 (1988), in part, because Bey's confession was improperly admitted.
Marko Bey was a juvenile, age 17, ten days shy of his 18th birthday, at the time of the Alston murder. After a R. 5:22-2 hearing, jurisdiction was transferred to the Law Division. Bey was indicted on July 5, 1983. The indictment charged him with the knowing or purposeful murder of Cheryl Alston on April 2, 1983 by his own conduct, contrary to N.J.S.A. 2C:11-3a(1) and (2) (count one); felony murder, contrary to N.J.S.A. 2C:11-3a(3) (count two); aggravated assault, contrary to N.J.S.A. 2C:12-1b(1) (count three); and aggravated sexual assault, contrary to N.J.S.A. 2C:14-2a(3) (count four).
The first trial had been held from November 29 to December 13, 1983 and defendant was found guilty on all counts. The sentencing phase concluded on December 15, 1983. The jury concluded that the aggravating factors outweighed the mitigating factors and imposed the death sentence. As noted, the *454 Supreme Court vacated defendant's death sentence on August 2, 1988 because he had been a juvenile at the time of the offense. The matter was remanded for retrial with the order that his confession to the police be suppressed. State v. Bey I, 112 N.J. 45, 548 A.2d 846 (1988). Defendant's death sentence in a separate murder case involving Carol Peniston was also vacated the same day, but the conviction was affirmed. State v. Bey II, 112 N.J. 123, 548 A.2d 887 (1988). He has since again been convicted and sentenced to death in the Peniston case. The appeal from that second Peniston murder conviction was argued in the Supreme Court on October 8, 1991 and is awaiting decision.[1] Counsel have advised us that the conviction in this case (Alston) was used by the State as a predicate aggravating factor in securing the capital conviction in the Peniston case.
After the reversal in the Alston case, the State conducted further investigation and discovered that defendant had confessed to two murders in early 1984 to a senior corrections officer while an inmate at the capital sentencing unit ("CSU" or "death row") at the New Jersey State Prison in Trenton. Investigators from the Monmouth County Prosecutor's Office interviewed the corrections officer, Alexander Pearson, and obtained a detailed statement of defendant's admissions allegedly concerning the Alston murder.
A pretrial hearing was held to determine the admissibility of Bey's statement to Pearson. In an order dated February 24, 1989 Judge Coogan ruled that the testimony of Officer Pearson was allowed into evidence. The judge specifically found that defendant's statement to Pearson was voluntarily and intelligently made and was not in response to interrogation.
*455 The retrial before Judge Ricciardi began on October 10, 1989 and continued until October 17, 1989, when the jury found defendant guilty on all counts. Judge Ricciardi sentenced defendant to life imprisonment, with a 30-year parole disqualifier on count one, murder; and to a consecutive term of 20 years, with a 10-year parole disqualifier on count four, aggravated sexual assault. A $2,000 VCCB penalty was also imposed. Counts two and three were merged. Defendant's motion for a new trial on the ground that the verdicts were against the weight of the evidence was denied.

I
These are the facts presented at the retrial. Cheryl Alston (Alston), a 19 year-old black woman, lived with her parents and four siblings in Asbury Park. Venderlyn Alston, Alston's mother, was with her daughter on the night of April 1, 1983. She recalled that she had picked Alston up that evening near the Grand Union, and they drove to some friends' houses before returning home at about "11:30, quarter to twelve." Mrs. Alston went into their house, located in the rear of the property, while Alston went to visit her friend "Princess" who lived a few houses away. Alston returned home about 12:30 a.m. and sat out in front of the house on a brick embankment. Mrs. Alston could see her from the window.
At about 1:30 a.m. Alston's sister Angela Alston arrived home from work. When asked about Alston, Angela Alston told her mother that she was not outside but suggested she may have gone back to "Princess'" house. Mrs. Alston looked around the neighborhood and called friends, but was unable to locate Alston. She finally went to bed sometime after 4 a.m., but awoke early. Mrs. Alston assumed Alston had come home and was in her room; however, after hearing the phone in Alston's room ring unanswered she checked and discovered she was not there. Now panicked, the Alstons spent Saturday calling friends and looking for her. On Sunday, Mrs. Alston *456 went to the police station and was advised that her daughter's body had been found.
Alston's body was found by a jogger early Saturday morning, April 2, 1983, in a vacant lot in Ocean Grove, Neptune Township, just west of the boardwalk. Lt. Bruce Newman of the Monmouth County Prosecutor's Office was called to the scene at 7 a.m. The area had already been secured by the Neptune police to avoid contamination of the scene. Lt. Newman described the area as a large, open flat area with compacted, gravelly soil. Abandoned bathhouses were located nearby.
The victim was lying face up in the center of the area, unclothed except for a bra tied around her neck. Lt. Newman discerned that Alston had suffered many blunt force injuries. He observed injuries to her chest with linear marks 1 to 2 inches wide, and her face was "pretty much destroyed." Her jaw appeared broken and her teeth were protruding. Due to the condition of the body, identification was impossible. Her body was later identified through dental records by her dentist, Dr. McNamara.
An autopsy was conducted by Dr. Sinha on April 2, 1983. Dr. Stanley Becker, the county medical examiner, also reviewed the records of the autopsy. The autopsy "revealed multiple blunt trauma with penetrating wounds of the left eye, nose, left side of the face and oral cavity with numerous fractures of the facial bones" and lower and upper jawbone. There was a three-inch gaping wound of the forehead causing exposure of the frontal bone of the skull, and the left eye was pushed inward. Abrasions were found around the neck, and the victim's chest revealed "horizontal linear contusions," consistent with being caused by a two-by-four piece of wood. Dr. Becker testified that in addition to the injuries to the victim's face and head, there was evidence of a fracture of the hyoid bone in the neck, consistent with a ligature from the victim's bra. He felt that "the strangulation probably produced only a loss of consciousness" and the blunt trauma to the head, chest and abdomen, *457 causing swelling and hemorrhage, were the main cause of death.
The police investigated the lot and surrounding bathhouses. In the lot, a three-inch depression was found in the compact soil where the victim's head was located. Blood saturated the soil for a depth of about two inches. A single set of footprints was found leading from the bathhouses to the victim's body, a distance of about 70 feet; they continued to the south side of the lot, ending at the pavement at Spray Avenue. Along the path of footprints, a two-by-four piece of wood was found which had a depression with blood and hair on it. The police believed the wood was the murder weapon since the edge dimensions of the two-by-four were comparable to Alston's linear injuries. The two-by-four was preserved and plaster casts were made of two of the most detailed footprints.
The police also examined the four bathhouses located about 70 feet from the body and at the start of the path of footprints. On a walkway between the bathhouses, the police found items of clothing later identified as the clothing Alston was wearing when last seen. Cosmetic items were also found and identified as Alston's. In another room of the bathhouse, tissues and the cover of a Saturday Evening Post magazine, with blood on it, were discovered. Her pocketbook was not found.
The defendant, Marko Bey, was arrested on May 6, 1983, about five weeks after the crime, at his mother's house in Neptune. Bey was arrested that day for his suspected involvement in the murder of Carol Peniston on about May 1, 1983. He was also a suspect in the Alston murder at this time. See State v. Bey II, 112 N.J. 123, 132, 548 A.2d 887 (1988). At the time of the defendant's arrest, the house was searched and two pairs of sneakers were seized from a common closet. Blood, saliva and hair samples were also collected from the defendant. Investigator Philip George of the Monmouth County Prosecutor's office later measured the distance from Bey's house to the crime scene. The most direct route was 1.7 miles. The crime *458 scene was about 1.1 miles from the victim's home. Linda Jankowski, principal forensic scientist at the New Jersey State Police Lab, did some of the advanced enzyme work on blood samples submitted by the police and oversaw the work of another forensic scientist. The forensic scientists examined blood and saliva samples from Bey and Alston, as well as samples from the scene. Blood samples revealed that both the victim and the defendant had Type A blood and were "secretors."[2] Testing for the PGM genetic enzyme marker revealed that the victim was a 1+/1- while the defendant was classified as a 2+/2-. The blood stains on the two-by-four wood and the magazine cover were consistent with the victim's blood type and enzyme marker.
Oral, anal and vaginal swabs, taken from the victim, were also tested for enzyme markers. The oral swab could not be tested because of the presence of blood; the anal swab tested positive for spermatozoa but it was impossible to obtain any genetic markers from it because of contamination. The vaginal swab also was positive for spermatozoa which had a 2+/1+ PGM marker, not consistent with the defendant, and had come from another man. Jankowski testified that semen can be found in vaginal fluid for up to 48 hours after intercourse, although it is rare to find it more than 16 hours after. Hypothetically, she stated it would be impossible to chemically differentiate the types of two men's semen mixed in the victim's vaginal fluid if two men had left semen during that time period.
The police lab also tested a stain on the victim's jacket. The stain was composed of a combination of blood, semen and saliva. The fluids were from a blood Type A secretor with a mixture of genetic markers consisting of 1+/1- and 2+/2-. Jankowski determined that the stain contained four separate *459 "bands" of genetic markers; since each individual has two bands, she concluded that the fluids of two different persons contributed to the stain. Since semen can only come from a male, she assumed that the blood came from the victim. Assuming that the blood came from the victim, who had a 1+/1- PGM enzyme marker, the semen would have had a 2+/2- PGM enzyme marker, consistent with the genetic markings of the defendant. She stated that only 2.3% of the total black population, male and female, have a 2+/2- PGM marker.
The plaster casts made from the footprints found near the victim's body on the beach were compared with the sneakers taken from the defendant's home. Stephen Andrews, a principal forensic scientist in the State Police toxicology department, examined the plaster casts and the sneakers. Andrews testified that while he had no formal training in footprint comparison, he had gained on-the-job experience doing comparisons over the six years he was in the trace evidence unit. Andrews compared the Pro-Ked sneakers to the plaster imprint and was able to conclude that they were "the same size, pattern and make" sneakers. No unique cuts or wear marks were discernible from either the casts or the sneakers.
Theodore Mozer, a principal forensic chemist in the State Police Lab trace evidence unit, testified that he examined head and pubic hair samples of both the victim and the defendant, as well as the victim's clothing for possible evidence. Mozer concluded that hairs found on the victim's jacket, sweater, bra and panty hose all came from the victim's head. Pubic hair found on the victim's jacket and panties matched the victim's pubic hair samples. No hairs were found which compared with the defendant. Mozer stated that about 20% of the time they find a transfer of hairs in assault and homicide cases.
The State's key witness at trial was Alexander Pearson, a corrections officer who had supervised the defendant in 1983 *460 and 1984 when he was assigned to his wing.[3] Pearson initially spoke to Bey when he was assigned to the wing and explained the rules and what was expected of him. Pearson would see the defendant for about eight hours a day. They engaged in daily conversations about various subjects. He testified that they had a "man-to-man relationship," and they often spoke about "everyday life, sports, women, different things."
Early in the defendant's custodial period (late 1983 or early 1984), he and the defendant had "more than one" conversation as to why Bey was in custody. Pearson recalled that defendant told him "that he had beat and raped a woman on the beach." Pearson did not recall whether Bey specified the age of the victim, the county or town in which it occurred, or whether he used his hands or a weapon. He did recall that Bey told him the victim died. Pearson said that he did not ask any questions of the defendant, he stated "I was listening. I wasn't interrogating him."
Pearson's original statement on this matter was taken by Investigator George of the Monmouth County Prosecutor's Office on September 19, 1988. Officer George had interviewed 12 or 13 corrections officers in September 1988 after the August 2, 1988 reversal of Bey's capital conviction because his confession was ruled inadmissible. State v. Bey I, supra, 112 N.J. at 53-54, 548 A.2d 846. Pearson was the last one contacted. Pearson denied that his recollection was vague, even though he was not interviewed regarding the conversation until September 1988 when he was first contacted about any conversations with Bey.
In an attempt to further corroborate defendant's statement to Pearson that he "beat and raped a woman on the beach," the State presented evidence from other oceanfront counties. *461 Thomas Rizzo of the Middlesex County Prosecutor's Office and Edward Murphy of the Ocean County Prosecutor's Office both testified that there had been no homicides of females on beaches in either of their counties from March 19, 1983 until May 6, 1983, the date of defendant's arrest. The parties stipulated that "for several years prior to March 19, 1983, the defendant Marko Bey was residing outside of the State of New Jersey." The stipulation was used to prevent the jury from learning that Bey had been incarcerated before March 19, 1983, his juvenile parole date when he had been released and was at large.
At the close of the State's evidence, defense counsel moved for a judgment of acquittal pursuant to R. 3:18-1. This motion was denied by Judge Ricciardi. Defendant Bey did not testify or present any witnesses. On October 17, 1989, the jury found defendant guilty of all charges and his post-trial motions were denied.

II
The defendant raises four separate points on this appeal which we list in his own words:
ISSUE I  THE DEFENDANT'S SIXTH AMENDMENT RIGHTS WERE VIOLATED BY THE ADMISSION OF A STATEMENT WHICH HE ALLEGEDLY MADE TO A CORRECTIONS OFFICER IN THE ABSENCE OF COUNSEL.
ISSUE II  THE MOTION FOR A JUDGMENT OF ACQUITTAL SHOULD HAVE BEEN GRANTED BECAUSE THE STATE SIMPLY FAILED TO PROVE THAT DEFENDANT HAD MURDERED CHERYL ALSTON, AND BECAUSE THERE WAS INSUFFICIENT CORROBORATION OF DEFENDANT'S ALLEGED CONFESSION.
ISSUE III  THE TRIAL COURT'S USE AT SENTENCING OF A COERCED CONFESSION WHICH HAD PREVIOUSLY BEEN SUPPRESSED BY OUR SUPREME COURT WAS A VIOLATION OF DEFENDANT'S FIFTH AMENDMENT RIGHTS.
ISSUE IV  THE TRIAL JUDGE VIOLATED THE GUIDELINES OF STATE V. YARBOUGH BY IMPOSING A CONSECUTIVE SENTENCE ON THE SEXUAL ASSAULT CHARGE.
[We do not publish our discussions on Issues II, III and IV raised by defendant on this appeal because the resolution of *462 these issues does not meet the criteria for published opinions. See R. 1:36-2.]
Defendant does not raise any Fifth Amendment or Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), objections to the admission of his statement to the prison guard, Pearson, although this ground was raised in the Law Division. We now address the right to counsel claim raised under Issue I.

III
Defendant first contends that his federal Sixth Amendment and State constitutional right to counsel "were violated by the admission of a statement which he allegedly made to a corrections officer." The renewed investigation which uncovered the statement was prompted by the reversal of defendant's capital conviction which had precluded use of his confession at the retrial. State v. Bey I, supra, 112 N.J. at 53-54, 548 A.2d 846. As a result of this investigation, Investigator George of the Monmouth County Prosecutor's Office took the statement from Officer Pearson on September 18, 1988, between four to five years after defendant's admissions were made. The statement, in pertinent part, recites:
I would say a couple of days after he was in the Unit, I talked to him about why he was here, and he told me that he killed two women, and we talked about why he did it, he told me that he was high, and that he raped one of the women and then beat her. I remember him saying to me that it was on the beach where he raped and beat the one woman. He told me that he was sorry he did it, and didn't know why he did it. He also mentioned something about after he did it, he took a car and went to Newark, to a Club Zanzibar. Basically that's all we talked about concerning the murder of the women.
Bey first came to the CSU on December 16, 1983. Defendant did not give any details, beyond those in the statement, such as the ages or names of the victims or the dates of the murders.
On December 21, 1988 the prosecutor moved to admit Pearson's statement at the retrial. The defendant responded with a brief arguing that the statement violated his Fifth and Sixth Amendment rights because he had neither been advised of nor *463 waived his Miranda rights and the statement was made after the initiation of formal proceedings without prior notice to his attorney.
An Evid.R. 8 hearing was held in February 1989 before Judge Coogan. The evidence showed that the CSU was created from the former Administration Segregation Unit in May of 1983. It consists of 48 cells, a recreation area and visiting area. All of the cells, which are on two levels, face the corrections officer. Each cell holds only one inmate. Each has a solid sliding door with a food access port on the left hand side. When the CSU opened in 1983, each shift would consist of two officers; one in the booth would control the doors and the other on the floor would supervise the housing unit.
The floor officer would engage in a 15-minute close watch check, feed the inmates and take care of their sanitary needs. During that close check, the floor officer would patrol the area, making sure it was secure and that the inmates were not attempting suicide. The officer could view the inmates through a four-inch glass panel in the cell door. The officer and inmate could converse through the food port and through a space in the sliding doors.
Because of the stress suffered by capital defendants, George Saxton, a clinical psychologist who served as a consultant to the Department of Corrections, advised the CSU officers about the type of psychological problems that they could expect these inmates to exhibit. These inmates were considered risks for suicide and Dr. Saxton advised the CSU officers about the early warning signs. He encouraged the CSU officers to keep good communications with the inmates and to learn their habits so changes in behavior could be detected early.
Officer Pearson first met defendant on December 16, 1983 after he had been sentenced to death following his first trial. Pearson met him in the inmate receiving area and escorted him to the CSU. He instructed defendant as to what was expected of him and that "as long as [defendant] did not disrespect him *464 there would be no trouble." Pearson would talk to the inmates to pass the time. The topics would range from sports, to women, to places they had each been, to news. Eventually the topic of why defendant was in the CSU came up. Pearson testified:
Q. Tell us as best you can recall the content of that conversation, what occurred?
A. It was just that he had messed up and the reason why he was here.
Q. What did he say was the reason why he was in the Capital Sentence Unit?
A. For some murders he committed.
Q. Did he indicate how many?
A. Two that I recall.
Q. And do you recall what, if anything, he said about either one of those two murders?
A. Well, the one murder, I don't know which one it was particularly, but he took the woman's car and he went to Newark to Zanzibar.
Q. Do you recall any conversation about another murder?
A. Vaguely, yeah, I recall the conversation, yeah.
Q. Do you recall any conversation about sexual assault upon women?
A. Yeah.
Q. What did he say?
A. That he raped a woman and then he killed her.
Q. Did he indicate to you where she was raped?
A. All I remember was about a beach.
Q. Did he indicate to you whether or not  how he killed her, the woman on the beach?
A. He said he beat the woman.
Defendant also told Pearson "if it weren't for the drugs and alcohol, he wouldn't have been here."
Pearson also stated that they would discuss defendant's crimes if defendant brought it up. Pearson admitted, however, to asking questions, "if it was something I didn't understand." The specific example given was "I asked him why would he do that. What kind of mind you was in." [with regard to why defendant killed the women]. Pearson claimed his purpose in asking was "a human question. I asked a question." He said that he was just curious.
Officer Pearson was aware of defendant's pending appeal. During his training, he had been told that all capital cases *465 automatically were sent to the New Jersey Supreme Court for review. Pearson was also the officer who placed telephone calls to defendant's lawyer for him. He admitted asking defendant questions about the appeal such as, "did you talk to your lawyer," and discussing the appeal with defendant.
No report of these conversations was ever prepared or filed by Officer Pearson. He did not mention them to anyone until questioned by Investigator George in September of 1988. He was never instructed to solicit incriminating statements from inmates. Investigator George asked several other corrections officers if they had spoken to defendant before gleaning Pearson's information. Officer Pearson apparently was reluctant at first to reveal the contents of his conversations with defendant to the prosecutor; however, he did so because he believed it to be a direction from his superiors, observing: "You don't refuse your superiors." He did not later, however, feel compelled to cooperate similarly with the public defender.
At the conclusion of the Evid.R. 8 hearing, Judge Coogan ruled defendant's statement to Pearson admissible. Specifically, the judge found that "Pearson never set out to gain information from Mr. Bey in the capacity of being a corrections officer; ... they were talking, as he described it, man to man." Rather, the judge found that the defendant volunteered information to Officer Pearson during conversations initiated by defendant. He found that Pearson was merely engaging in conversation and not acting in the role of a law enforcement agent. The judge said: "What was revealed to him was revealed in a very personal way." Finally, Judge Coogan found, beyond a reasonable doubt, that Officer Pearson's testimony was "extremely credible" and that "the credibility factor is enhanced because of his ability to remember specific details such as the trip to Club Zanzibar."
Judge Coogan concluded that the Miranda rule was not violated under these circumstances, and that the statements were voluntary, not the product of coercion. He made no *466 findings regarding a possible Sixth Amendment right-to-counsel violation. As noted, the defendant now has abandoned the Fifth Amendment argument, and instead contends that the introduction of Pearson's testimony into evidence violated the Sixth Amendment to the federal Constitution and Art. I, para. 10 of the New Jersey Constitution. The defendant contends that since formal charges against him had been filed, Pearson had no right to question him or talk with him about the case without permission and the presence, or waiver, of counsel.
In order to establish a violation of the Sixth Amendment's right to counsel, a defendant must demonstrate that there was a deliberate elicitation by a law enforcement agent. Whenever a government agent at the State's behest deliberately elicits incriminating information from a represented defendant, the Sixth Amendment's right to counsel is impaired, and the proffered statements are inadmissible at trial. State v. Clausell, 121 N.J. 298, 350-352, 580 A.2d 221 (1990); see Maine v. Moulton, 474 U.S. 159, 168-174, 106 S.Ct. 477, 483-486, 88 L.Ed.2d 481, 490-495 (1985); United States v. Henry, 447 U.S. 264, 270, 100 S.Ct. 2183, 2186, 65 L.Ed.2d 115, 122 (1980); Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). We consider the federal and State constitutional rights to counsel as coextensive in this context, as Clausell suggests, 121 N.J. at 350, 580 A.2d 221, and State v. Fritz, 105 N.J. 42, 58, 519 A.2d 336 (1987), appears to hold. Once formal charges have been filed against a defendant, and the accused has an attorney, a "distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect." Patterson v. Illinois, 487 U.S. 285, 290 n. 3, 108 S.Ct. 2389, 2393 n. 3, 101 L.Ed.2d 261, 271 n. 3 (1988); State v. Clausell, 121 N.J. 298, 351, 580 A.2d 221 (1990). Under the Sixth Amendment, a law enforcement agent may not question the defendant in any manner unless and until he has knowingly and intelligently waived his right to have an attorney present. Patterson v. Illinois, supra, 487 U.S. at 292, 108 S.Ct. at 2394, 101 L.Ed.2d at 272.
*467 The first issue we must address is whether Officer Pearson was a "law enforcement agent" during his conversations with defendant. Judge Coogan concluded, in effect, that Pearson was not acting in a law enforcement capacity. This conclusion was error.
New Jersey specifically provides that a corrections officer is a law enforcement officer. N.J.S.A. 2A:154-4 states that:
All correction officers of the State of New Jersey .. . who have been or who may hereafter be appointed or employed, shall by virtue of such appointment or employment and in addition to any other power or authority be empowered to act as officers for the detection, apprehension, arrest and conviction of offenders against the law.
The section grants full police status to corrections officers. State v. Thompson, 142 N.J. Super. 274, 280, 361 A.2d 104 (App.Div. 1976) (guard in a prison is generally associated with the generic term "law enforcement"). See also State v. Grant, 102 N.J. Super. 164, 167-168, 245 A.2d 528 (App.Div.), certif. denied, 53 N.J. 62, 247 A.2d 885 (1968) (assault on corrections officer justifies conviction for assault on law enforcement officer); Allen v. Passaic County, 219 N.J. Super. 352, 374, 530 A.2d 371 (Law Div. 1986) ("corrections officers ... are recognized as law enforcement officers and as such may enforce the criminal law of this State...."). We conclude that Officer Pearson was clearly a law enforcement officer in the course of his duties.
His communication with the inmates was encouraged to allow for early detection of behavior changes in the capital unit prisoners. His duties include preventing suicide. Since it was very hard for the inmates to speak with each other because of the cells' configuration, the circulating corrections officer was one of the few people they could have any daily contact with. It was Officer Pearson's job to talk to and watch the defendant. Any conversation, whether "man to man" or otherwise, was within his scope of employment as a law enforcement agent. This determination of Pearson's status, however, does not end our inquiry.
*468 We must also examine whether defendant's statements concerning the two murders were "deliberately elicited" by the State in violation of his right to counsel. The fact they were made to a person with law-enforcement interests without an explicit and knowing waiver of counsel, does not automatically invoke the exclusionary rule.
The seminal case involving a violation of the Sixth Amendment by questioning a represented defendant in the absence of counsel is Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). There, incriminating statements of a defendant, indicted but free on bail, were secretly monitored by a body wire on the person of a co-defendant who had agreed to act as an informant. The statements were then used at trial. On appeal, the federal Supreme Court reversed, holding that defendant had been denied his Sixth Amendment protections when "his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of counsel" were used at trial. Id. at 206, 84 S.Ct. at 1203, 12 L.Ed.2d at 250.
A litany of case law has since developed concerning so-called "jailhouse informants," involving admissions or confessions given while a defendant is indicted and awaiting trial. The next case, United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), involved a confession by the defendant to another inmate who had been solicited by government agents to act as an informant. He was told to "be alert to any incriminating statements, but not to initiate any conversation[s] with or question Henry...." Id. at 266, 100 S.Ct. at 2184, 65 L.Ed.2d at 121. The informant, however, was not a dutiful passive listener, but had "some conversations" with defendant, producing the incriminating evidence. Id. at 272, 100 S.Ct. at 2187, 65 L.Ed.2d at 122-123. The Supreme Court reversed the conviction, holding that there was a violation of defendant's Sixth Amendment right not to be questioned without his attorney present. The Court noted that it was not critical to determine who first raised the subject of the crime under investigation; it *469 was only necessary that a "deliberate elicitation" had occurred. Id. at 272, 100 S.Ct. at 2187, 65 L.Ed.2d at 123.
The federal Supreme Court again interpreted the "deliberate elicitation" standard in Maine v. Moulton, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). The police entered into an agreement with a co-defendant to tape phone conversations with defendant, Moulton, who had been indicted for receiving stolen automobiles and who was free on bail pending trial. Moulton initiated the phone conversations and requested a meeting at which the incriminating statements were recorded. The Supreme Court concluded that the question of who set up or initiated the meeting was "irrelevant" because:
The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State. As noted above, this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation.... However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent. [Id. at 176, 106 S.Ct. at 487, 88 L.Ed.2d at 496; emphasis added].
Finally, in Kuhlmann v. Wilson, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), the federal Supreme Court somewhat limited its prior holdings on the point by ruling that
it is not a violation of the Sixth Amendment when an informant, either through prior arrangement or voluntarily, reported [defendant's] incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took such action beyond merely listening, that was designed deliberately to elicit incriminating statements. [Id. at 459, 106 S.Ct. at 2630, 91 L.Ed.2d at 384-385].
We rely principally on two statements by Justice Powell in Kuhlmann v. Wilson which describe the scope and the intent of the principles protecting the attorney-client relationship from unwarranted intrusion in pretrial or custodial circumstances. Justice Powell first said:

*470 Earlier this Term, we applied the Massiah standard in a case involving incriminating statements made under circumstances substantially similar to the facts of Massiah itself. In Maine v. Moulton, 474 U.S. 159, 88 L.Ed.2d 481, 106 S.Ct. 477 (1985), the defendant made incriminating statements in a meeting with his accomplice, who had agreed to cooperate with the police. During that meeting, the accomplice, who wore a wire transmitter to record the conversation, discussed with the defendant the charges pending against him, repeatedly asked the defendant to remind him of the details of the crime, and encouraged the defendant to describe his plan for killing witnesses. Id. at 165-166, and n. 4, 88 L.Ed.2d 481 [488-489], 106 S.Ct. 477 [481-482]. The Court concluded that these investigatory techniques denied the defendant his right to counsel on the pending charges. Significantly, the Court emphasized that, because of the relationship between the defendant and the informant, the informant's engaging the defendant "in active conversation about their upcoming trial was certain to elicit" incriminating statements from the defendant. Id. at 177, n. 13, 88 L.Ed.2d 481 [496, n. 13], 106 S.Ct. 477 [487, n. 13]. Thus, the informant's participation "in this conversation was `the functional equivalent of interrogation.'" Ibid. (quoting United States v. Henry, 447 U.S. at 277, 65 L.Ed.2d 115 [126], 100 S.Ct. 2183 [2190] (Powell, J., concurring). [477 U.S. at 458-459, 106 S.Ct. at 2629-2630, 91 L.Ed.2d at 384; emphasis supplied].
Justice Powell concluded his reasoning this way:
As our recent examination of this Sixth Amendment issue in Moulton makes clear, the primary concern of the Massiah line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. Since "the Sixth Amendment is not violated whenever  by luck or happenstance  the State obtains incriminating statements from the accused after the right to counsel has attached," 474 U.S. at 176, 88 L.Ed.2d 481 [496], 106 S.Ct. 477 [487], citing United States v. Henry, supra, 447 U.S. at 276, 65 L.Ed.2d 115 [125], 100 S.Ct. 2183 [2189] (Powell, J., concurring), a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks. [477 U.S. at 459, 106 S.Ct. at 2630, 91 L.Ed.2d at 384-385; emphasis supplied].
In Kuhlmann, the police intentionally placed an informant in the cell with the defendant. Unlike the informant in United States v. Henry, he followed his instructions and did not ask defendant any questions. For this reason, the Supreme Court in Kuhlmann found no intrusion upon the right to counsel.
Our State's case law also requires the exclusion of statements "deliberately elicited" by government agents, even if the defendant initiates the conversation. In State v. Clausell, 121 *471 N.J. 298, 580 A.2d 221 (1990), the defendant was convicted of capital murder as well as other counts of aggravated assault and unlawful possession of a firearm. Our Supreme Court reversed and remanded on various procedural grounds. A trial judge ruling on invasion of the right to counsel reviewed on the cross-appeal by the State, however, was deemed correct. Tapes of three phone conversations between the defendant and police detectives were properly suppressed for violating the Sixth Amendment. The police detective speaking with defendant knew that defendant was represented by counsel when he spoke with him, but he did not warn the defendant that he was taping the conversations, that the statements could be used against him, or that he had the right to have an attorney present. Id. at 348-353, 580 A.2d 221.
The crux of the issue before us is whether the defendant's conversations with Officer Pearson amounted to a "deliberate elicitation" by the corrections officer. Two considerations are paramount. First, were the conversations between Pearson and defendant of the type which would "circumvent and thereby dilute the protection afforded by the right to counsel," per Maine v. Moulton, supra, 474 U.S. at 171, 106 S.Ct. at 484, 88 L.Ed.2d at 493. Second, how significant was the fact that Pearson made no formal investigative report of the conversations and only revealed them much later when the State reopened its investigation after the conviction was reversed.
A case similar in some aspects to our case is Whitehead v. State, 511 N.E.2d 284 (Ind. 1987), cert. denied, 484 U.S. 1031, 108 S.Ct. 761, 98 L.Ed.2d 773 (1988). There the Indiana Supreme Court held that statements a defendant made to a custodial youth care worker at a juvenile correctional institute were not the product of coercive or custodial interrogation, so that the Miranda requirements did not apply. The defendant had initiated the conversation and there was no evidence presented that the worker had any responsibility for investigating *472 the murder. The conversation apparently consisted of the defendant beginning with:
"Why didn't he stop, why didn't he stop me?"
"Stop you from what?"
"Stop me from killing her. Why didn't he stop me?" [Id. at 292].
The Indiana Supreme Court allowed this testimony, finding that the question posed by the worker was a natural one. Id. at 292-293. The court also held, however, that the worker was not a law enforcement officer, thus differing from our case, although the Indiana court stressed that he had no "responsibility for the investigation of this crime." Id. at 293.
One recent case about jailhouse informants is United States v. York, 933 F.2d 1343, 1355-1356 (7th Cir.1991). York was convicted of insurance fraud by arson and murder of his business partner. While he was in prison awaiting trial he made incriminating statements to a fellow inmate. The inmate, a regular informant for the FBI, did not report these statements, thinking defendant a liar, until corroborated by a newspaper article he later read. The Seventh Circuit held that defendant's Sixth Amendment rights were not violated. The informant was clearly a government agent, working for the government on other cases, but was not an agent for the purpose of this particular case. He had been under no direction to elicit information from defendant. The federal courts consistently have refused to extend the rule of Massiah and Henry to "situations where an individual, acting on his own initiative, deliberately elicits incriminating evidence." United States v. Malik, 680 F.2d 1162, 1165 (7th Cir.1982); United States v. Watson, 894 F.2d 1345, 1348 (D.C. Cir.1990); United States v. Metcalfe, 698 F.2d 877, 882 (7th Cir.), certif. denied, 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 814 (1983). See also State v. Buchholz, 97 Or. App. 221, 775 P.2d 896, 898 (1989), aff'd o.g., 309 Or. 442, 788 P.2d 998 (1990) (statement to juvenile parole officer admitted); State v. Brown, 153 Vt. 263, 571 A.2d 643, 646-647 (1989) (casual answers by defendant to his probation officer not violation of right-to-counsel).
*473 Officer Pearson was never instructed to obtain incriminating information from defendant. He made no contemporaneous report to the prosecuting authorities about the incriminating statements. Only the post-reversal investigation dug out the long-latent evidence. The conversation was casual and not designed to elicit evidence for the State to use against an unwary accused. No motivational or investigative nexus ever existed between the ear of Officer Pearson, a State corrections officer, and the investigative and prosecutorial arm of the State, the Monmouth County Prosecutor's Office. The State did not deliberately elicit the statements nor did it ever attempt or intend to circumvent or dilute the confidential relationship. It did not knowingly exploit the custodial situation or intentionally create the opportunity to intrude into the unavailability of counsel on the cellblock. This was not a secret questioning by investigatory techniques equivalent to direct police interrogation. The prosecutor discovered the defendant's admission to Officer Pearson quite by chance, after first speaking with several other corrections officers about defendant. As stated in United States v. Henry, supra, 447 U.S. at 276, 100 S.Ct. at 2190, 65 L.Ed.2d at 115:
Thus, the Sixth Amendment is not violated whenever  by luck or happenstance  the State obtains incriminating statements from the accused after the right to counsel has attached.
We conclude that discovering defendant's admission to Pearson was luck on the part of the State. This fortuitous discovery was not the product of a "deliberate elicitation" by a government agent. Although Pearson was certainly a law enforcement officer, he never listened to the statements intending their use as evidence at trial. He was not acting under the direction of the State when he had the discussions with defendant, except in performing his correction officer's duties, including suicide prevention. The circumstances under which the statements arose pass constitutional muster.
[Discussion of Issues II, III and IV redacted].
We do not reach defendant's final point on excessive sentencing because we must reverse and remand for resentencing.
*474 Conviction affirmed; reversed and remanded for resentencing on the aggravated sexual assault count.
NOTES
[1] The defendant's conviction in the Peniston case was affirmed by the Supreme Court shortly after certification was denied on this appeal from the defendant's conviction in the Alston case. See State v. Bey, 129 N.J. 557, 570, 617, 610 A.2d 814 (1992).
[2] Eighty percent of the public are secretors  individuals who secrete some blood type into their other bodily fluids. Thus, a secretor's blood type can be determined from other bodily fluids such as saliva or semen.
[3] The jury was not told that Pearson was assigned to work on the "death row" wing at the New Jersey State Prison in Trenton, where Bey was incarcerated prior to having his conviction reversed.