701 A.2d 952

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
MICHAEL LEOPARDI, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted October 8, 1997—Decided October 24, 1997.

Before Judges BAIME, BROCHIN and BRAITHWAITE.

*Ivelisse Torres*, Public Defender, attorney for appellant (*Edward C. Lehman*, Designated Counsel, of counsel and on the letter-brief).

Appellant submitted a *pro se* supplemental brief.

*Peter Verniero*, Attorney General, attorney for respondent (*Craig V. Zwillman*, Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

BAIME, J.A.D.

The principal question presented in this case is whether defendant's right to counsel was violated by the admission at trial of an incriminating note given by him to an inmate law librarian. Although the inmate agreed to deliver the note to defendant's codefendant who was housed in a different section of the jail, he instead surrendered it to the county prosecutor. We hold that the State did not deliberately extract the incriminating information in the absence of counsel, and the statement was thus properly admitted.

## I.

A jury found defendant guilty of conspiracy (*N.J.S.A.* 2C:5–2), first degree robbery (*N.J.S.A.* 2C:15–1), second degree aggravated assault (*N.J.S.A.* 2C:12–1b(1)), and possession of imitation cocaine with intent to distribute (*N.J.S.A.* 2C:35–11). The trial court sentenced defendant to sixteen years imprisonment on the conviction for first degree robbery and to a concurrent four year term on the imitation drug count. The remaining convictions were merged.

The convictions emanated out of a bizarre plot by defendant, Michael Noble, and Theodoros Merias, to sell fake cocaine to Alan Vitkosky, an undercover agent posing as a drug purchaser. As originally conceived, the plan called for defendant and his companions to exchange crumpled cookies disguised to look like cocaine for the payment of $3,300. The scheme went awry, however, when Noble reached into Vitkosky's waistband in an attempt to relieve him of his money and instead found a gun. In the ensuing struggle, defendant kicked Vitkosky's face, shattering his nose. Back-up units were immediately alerted, and defendant and his accomplices were quickly arrested.

At trial, defendant conceded that he, Noble and Merias attempted to sell imitation drugs to Vitkosky. He contended, however, that Vitkosky became upset when he realized that the "cocaine" that had been shown to him was really crumpled cookies. Defendant testified he kicked Vitkosky only when the agent reached for his gun. Defendant claimed that he was unaware of the fact that Vitkosky was a police officer, and that he had acted in self-defense.

Noble's version of the incident substantially corroborated defendant's account. Noble testified that in the course of transferring the fake cocaine, he noticed a gun protruding from Vitkosky's waistband. As he and defendant attempted to flee, Vitkosky "spun to the side," apparently reaching for the weapon. Noble claimed that he and defendant struggled with Vitkosky in an attempt to disarm him, and that they realized Vitkosky was a

police officer only when they heard sirens from nearby police cars. However, immediately after his arrest, Noble gave a written statement to the police in which he admitted that he and defendant attacked Vitkosky in an attempt to relieve him of his money which both men believed was concealed in the officer's waistband. Noble's written statement was read to the jury.

The State was also permitted to admit in evidence a letter defendant had written to Noble while the two men were confined in the Mercer County Detention Center. In the letter, defendant instructed Noble to tell his lawyer that they never intended to sell narcotics to Vitkosky and that they struck the officer because he was about to pull a gun from his waistband. Defendant had given the letter to Robert Packlaian, an inmate assigned to the jail's law library, with the direction that it be delivered to Noble. At defendant's behest, Packlaian had previously delivered a note to Noble and had arranged a meeting between the two men. This time, however, Packlaian notified Investigator Lester Worthington of the Mercer County Prosecutor's Office.

Packlaian had first met Worthington several months earlier. On that occasion, Packlaian received information about a homicide and reported what he learned to Detective William Hunt, a member of the Ewing Township Police Department. Hunt contacted Worthington, who then interviewed Packlaian. According to Packlaian, neither Hunt nor Worthington asked him to obtain additional information. However, several months later, another inmate, William Green, gave Packlaian a note in which he confessed that he had killed his wife and wanted to plead "temporary insanity." Packlaian reported the incident to Worthington. While making no specific promises to Packlaian, Worthington mentioned that he was aware of the charges then pending against him, and stated that he would apprise the appropriate authorities of his cooperation.

During his conversation with Worthington about the Green matter, Packlaian suddenly interjected the information he had received from defendant. Worthington knew nothing about defen-

dant's case. After obtaining directions from his supervisor, however, Worthington returned to the jail and retrieved defendant's letter from Packlaian. The trial court denied defendant's pretrial motion to suppress, finding that Packlaian had not acted as a government agent in obtaining the letter and that the State had not deliberately elicited defendant's incriminating statement in the absence of counsel.

## II.

We first address defendant's argument that admission of his letter to Noble violated his right to counsel. Defendant claims that the State used Packlaian as an investigatory tool with the specific intent of extracting incriminating information in the absence of his attorney. We reject this contention.

The purpose of the Sixth Amendment right to counsel is to "enable the defendant to confront the prosecution and to ensure the integrity of the judicial process." *State v. Sanchez,* 129 *N.J.* 261, 265, 609 *A.*2d 400 (1992). The constitutional right is premised on the notion that the "average defendant does not have the professional legal skill to protect himself." *Johnson v. Zerbst,* 304 *U.S.* 458, 462–63, 58 *S.Ct.* 1019, 1022, 82 *L.Ed.* 1461, 1465 (1938). Because of its "exalted status," in the hierarchy of constitutional protections, *State v. Tucker,* 265 *N.J.Super.* 296, 326, 626 *A.*2d 1105 (App.Div.), *aff'd,* 137 *N.J.* 259, 645 *A.*2d 111 (1994), *cert. denied,* 513 *U.S.* 1090, 115 *S.Ct.* 751, 130 *L.Ed.*2d 651 (1995), the right to counsel attaches at or immediately after the "initiation of adversary judicial criminal proceedings." *Kirby v. Illinois,* 406 *U.S.* 682, 689, 92 *S.Ct.* 1877, 1882, 32 *L.Ed.*2d 411, 417–18 (1972); *see also, Michigan v. Jackson,* 475 *U.S.* 625, 629, 106 *S.Ct.* 1404, 1407, 89 *L.Ed.*2d 631, 638 (1986). It is undisputed that formal adversarial proceedings had been instituted against defendant when he gave Packlaian the letter to be delivered to Noble. At issue, therefore, is whether the letter was obtained in violation of defendant's Sixth Amendment right to counsel.

Once the right to counsel has attached and has been asserted, the State is obliged to honor it. This obligation encompasses more than preventing the accused from obtaining the assistance of counsel. *Maine v. Moulton*, 474 *U.S.* 159, 170–71, 106 *S.Ct.* 477, 484, 88 *L.Ed.*2d 481, 492 (1985). The Sixth Amendment also "imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance." *Id.* at 171, 106 *S.Ct.* at 484, 88 *L.Ed.*2d at 492. The police and the prosecutor may not act "in a manner that circumvents [or] dilutes the protection afforded by the right to counsel" *Ibid.* The constitutional guaranty protects against governmental intrusion into the "intimate relationship" between a defendant and his attorney. *State v. Sugar*, 84 *N.J.* 1, 13, 417 *A.*2d 474 (1980). It applies with equal force in the more subtle context of indirect and surreptitious interrogations involving "jailhouse informants." *State v. Bey*, 258 *N.J.Super.* 451, 468, 610 *A.*2d 403 (App.Div.1992), *certif. denied*, 130 *N.J.* 19, 611 *A.*2d 657 (1992).

The seminal case involving a violation of the Sixth Amendment by questioning a represented defendant in the absence of an attorney is *Massiah v. United States*, 377 *U.S.* 201, 84 *S.Ct.* 1199, 12 *L.Ed.*2d 246 (1964). There, incriminating statements of a defendant, indicted but free on bail, were secretly monitored by a "body wire" on the person of a codefendant who had agreed to act as an informant. The statements were admitted at trial. The Supreme Court reversed, holding that the defendant had been denied his Sixth Amendment rights when "his own incriminating words ... [were] deliberately elicited from him [by the federal agents] after he had been indicted and in the absence of counsel." *Id.* at 206, 84 *S.Ct.* at 1203, 12 *L.Ed.*2d at 250.

*United States v. Henry*, 447 *U.S.* 264, 100 *S.Ct.* 2183, 65 *L.Ed.*2d 115 (1980), followed in the wake of the Supreme Court's opinion in *Massiah.* In *Henry*, the defendant confessed to an inmate that he had participated in a bank robbery. The inmate was a paid informer who allegedly had been placed in the same cell as the defendant by federal agents in order to secure information con-

cerning the robbery. He had been told by the agents to "be alert to any incriminating statements, but not to initiate any conversation or question [the defendant]." *Id.* at 266, 100 *S.Ct.* at 2187, 65 *L.Ed.*2d at 119. The Supreme Court reversed the conviction, holding there was a violation of the defendant's Sixth Amendment right not to be questioned without his attorney present. *Id.* at 274, 100 *S.Ct.* at 2189, 65 *L.Ed.*2d at 125. In reaching this conclusion, the Court reasoned that the defendant's incarceration at the time he was engaged in a conversation by the informer "ma[d]e him particularly susceptible to the ploys of [the] undercover ... agent" because he and the informer appeared to "share[ ] a common plight." *Ibid.* The Court said in this context that it was not critical to determine who instigated the subject of the crime under investigation, but it was only necessary that a " 'deliberate elicitation' of incriminating statements" had occurred. *Id.* at 272, 100 *S.Ct.* at 2187, 65 *L.Ed.*2d at 123.

These principles were subsequently applied in *Maine v. Moulton*, 474 *U.S.* 159, 106 *S.Ct.* 477, 88 *L.Ed.*2d 481. There, the police entered into an agreement with the defendant's codefendant to tape record conversations relating to the theft of automobiles. Although the defendant initiated the incriminating conversations that were recorded, the Court held that "knowing exploitation by the State of an opportunity to confront the accused without counsel" constituted a violation of the Sixth Amendment. *Id.* at 176, 106 *S.Ct.* at 487, 88 *L.Ed.*2d at 496. The Court added that "[i]t was the police who suggested to [the codefendant] that he record his telephone conversations with [the defendant] ... and [it was the police who] put a body wire transmitter on him." *Id.* at 176–77, 106 *S.Ct.* at 487, 88 *L.Ed.*2d at 496. By taking this action, the State was said to have "knowingly circumvented Moulton's right to have counsel present." *Id.* at 180, 106 *S.Ct.* at 489, 88 *L.Ed.*2d at 499.

The Court last revisited this subject in *Kuhlmann v. Wilson*, 477 *U.S.* 436, 106 *S.Ct.* 2616, 91 *L.Ed.*2d 364 (1986). There, as in *Henry*, the defendant, who was charged with murder and robbery,

was placed in a jail cell with a paid informer. In a conversation with the informer, the defendant initially denied that he was involved in the crimes. The informer responded that defendant's denial "did not sound too good." *Id.* at 439–40, 106 *S.Ct.* at 2619, 91 *L.Ed.*2d at 372. Several days later, the defendant admitted to the informer that he had committed the murder and robbery. A divided panel of the Court of Appeals for the Second Circuit reversed the district court's denial of the defendant's petition for a writ of *habeas corpus*, finding that the facts were indistinguishable from those in *Henry*. *Wilson v. Henderson*, 742 *F.*2d 741, 746–47 (2d Cir.1984). The Supreme Court reversed, holding that "a defendant does not make out a violation [of the Sixth Amendment] simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police." 477 *U.S.* at 459, 106 *S.Ct.* at 2630, 91 *L.Ed.*2d at 384. Instead, "the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Ibid.* In reaching this result, the Court stressed that "the primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Ibid.*

▮▮▮▮ Against this backdrop, candor requires us to confess our difficulty in reconciling several of these decisions. However, we are able to distill several unifying themes. The existence or absence of an explicit agreement or prearrangement between law enforcement and an informer is obviously an important factor in determining whether the informer is serving as a government agent in an attempt to secure information against the accused. *See, e.g., Thomas v. Cox*, 708 *F.*2d 132, 136–37 (4th Cir.), *cert. denied*, 464 *U.S.* 918, 104 *S.Ct.* 284, 78 *L.Ed.*2d 262 (1983). Similarly, governmental involvement placing an informant near the defendant may be a critical circumstance in determining whether incriminating information has been deliberately elicited by the State in the absence of the accused's attorney. *See, e.g.,*

*Lightbourne v. Dugger*, 829 *F*.2d 1012, 1021 (11th Cir.), *reh'g denied*, 835 *F*.2d 291 (11th Cir.1987); *cert. denied*, 488 *U.S.* 934, 109 *S.Ct.* 329, 102 *L.Ed.*2d 346 (1988); *Colorado v. Freeman*, 739 *P*.2d 856, 859 (Colo.Ct.App.1987). Another criterion is the source of the informer's motivation—specifically, whether he or she has been promised a reward in return for obtaining information. *State v. Nations*, 319 *N.C.* 318, 325, 354 *S.E.*2d 510, 514 (1987). While no "definitive test" has yet been developed in determining whether an informer serves as a government agent in obtaining incriminating information and whether the State's involvement is sufficient to ground a finding of "deliberate elicitation," the factors we have described form a valuable analytical framework for resolution of these issues. *See* James J. Tonkovicz, *An Adversary System Defense of the Right to Counsel Against Informants: Truth, Fair Play, and the Massiah Doctrine*, 22 *U.C. Davis L.Rev.* 1, 92 n. 283 (1988),

■ Applying these principles, we are in accord with the Law Division's finding that Packlaian was not serving as a government agent when he obtained defendant's letter and that the State did not deliberately elicit the incriminating information in the absence of counsel. The record is barren of any evidence suggesting the existence of an explicit or implicit agreement between Packlaian and the prosecution to secure information from defendant. Nor does the evidence indicate that the State was involved in placing Packlaian near the defendant in order to trick him into confessing. While perhaps Packlaian wished to curry favor with the prosecutor, no specific promise of lenity had been made to him at the time he was approached by defendant.

■ The simple and overriding fact is that defendant revealed his guilt unwittingly. But it is no more unfair to use the evidence he exposed through his lack of guile than it is to turn against him clues at the scene of the crime that a brighter, better informed, or more gifted criminal would have hidden. The Sixth Amendment "is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right

to counsel has attached." *Maine v. Moulton,* 474 *U.S.* at 176, 106 *S.Ct.* at 487, 88 *L.Ed.*2d at 496 (Powell, J., concurring).

Packlaian voluntarily reported defendant's statement to the police after initially aiding him in arranging a meeting with Noble. Undoubtedly, defendant's reliance on Packlaian's loyalty was misplaced. However, neither an ordinary citizen nor an inmate in jail should be discouraged from reporting what he knows to the authorities and from lending his aid in surrendering evidence of crime he has obtained. We doubt the soundness of a rule that would insulate defendant from Packlaian's apostasy. It was defendant's poor luck or poor thinking in enlisting Packlaian that led to the disclosure of incriminating evidence. It was not the State's violation of the Sixth Amendment.

## II.

In his principal brief, defendant additionally contends: (1) the trial court erred by permitting a witness to read to the jury Noble's prior statement to the police, (2) the trial court erroneously denied a motion for a judgment of acquittal at the close of the State's case, (3) the verdict was against the weight of the evidence, and (4) the sentences were manifestly excessive. In a *pro se* supplemental brief, defendant claims: (1) he was deprived of a fair trial because the trial judge failed to notify him that she was acquainted with a juror and (2) he was denied the effective assistance of counsel.

The arguments advanced in the principal brief are clearly without merit and do not require extended discussion. *R.* 2:11–3(e)(2). The trial court properly exercised its discretion in permitting the prosecution to read to the jury Noble's prior inconsistent statement made to the apprehending officer. *See N.J.R.E.* 613(b), 803(a)(1). In his trial testimony, Noble stated that he and defendant attacked Vitkosky because they noticed a gun tucked in his waistband. On cross-examination, the prosecutor questioned Noble regarding his statement made to the arresting officer at the time the crime was committed. In Noble's prior statement, he

admitted that he "saw a bulge in Vitkosky's waist and ... figured he had the money there and [he] was going to take it." Noble's statement at the time of his arrest was materially inconsistent with his trial testimony and was properly admitted for the truth of the matter asserted. *See State v. Pasha*, 280 *N.J.Super.* 265, 270, 655 *A.*2d 92 (App.Div.), *certif. denied*, 142 *N.J.* 453, 663 *A.*2d 1360 (1995); *State v. Ross*, 162 *N.J.Super.* 47, 51, 392 *A.*2d 210 (App. Div.1978), *aff'd in part, rev'd in part*, 80 *N.J.* 239, 403 *A.*2d 457 (1979); *State v. Ramos*, 217 *N.J.Super.* 530, 538, 526 *A.*2d 284 (App.Div.1987); *State v. Provet*, 133 *N.J.Super.* 432, 436–38, 337 *A.*2d 374 (App.Div.), *certif. denied*, 68 *N.J.* 174, 343 *A.*2d 462 (1975).

The evidence was sufficient to withstand defendant's motion for a judgment of acquittal, and the jury's verdict did not constitute a miscarriage of justice. Giving the State the benefit of all its favorable testimony as well as all legitimate inferences flowing from its proofs, a reasonable jury could find guilt of the charges beyond a reasonable doubt, *State v. Reyes*, 50 *N.J.* 454, 459, 236 *A.*2d 385 (1967). Specifically, the jury could reasonably find based on the evidence that defendant and his accomplices either inflicted or attempted to inflict serious bodily injury on Vitkosky while in the course of attempting to steal the victim's money. *N.J.S.A.* 2C:15–1. Moreover, the jury's verdict did not constitute a manifest denial of justice but instead was supported by ample evidence of guilt.

 We perceive no sound basis to disturb the sentences imposed. While perhaps the trial court "double counted" several aggravating factors, *see State v. Jarbath*, 114 *N.J.* 394, 404–05, 555 *A.*2d 559 (1989), we are satisfied that the overall sentences were fair and well deserved. *But see State v. Mara*, 253 *N.J.Super.* 204, 214, 601 *A.*2d 718 (App.Div.1992); *State v. Varona*, 242 *N.J.Super.* 474, 491, 577 *A.*2d 524 (App.Div.), *certif. denied*, 122 *N.J.* 386, 585 *A.*2d 389 (1990),

Finally, we are entirely unpersuaded by the arguments advanced in defendant's *pro se* brief. Initially, we reject defendant's

contention that he was deprived of a fair trial because he was not informed of the trial judge's relationship with the foreman of the jury. Defendant's contention is factually inaccurate. During the selection of the jury, the judge apprised the parties that she was acquainted with Alfred Ramey, a prospective juror. The judge noted that she had once worked with Mr. Ramey, who was presently employed as an assistant attorney general. Neither the prosecutor nor defendant requested additional information on the subject. Because Mr. Ramey had been placed in the first seat of the jury box, he was appointed jury foreman. Clearly, the relationship between the trial judge and the juror was fully disclosed. Although defendant had not exhausted his peremptory challenges, he chose to have Ramey remain on the jury. Plainly, no error occurred, and no prejudice resulted. We do not reach the merits respecting defendant's claim of deprivation of effective assistance of counsel because his argument rests upon facts not contained in the present record. While we note that the present record indicates defendant was ably and vigorously represented by his attorney, we cannot fairly adjudicate defendant's claim. Our affirmance of defendant's convictions and sentences is, of course, without prejudice to his right to file a petition for post-conviction relief with respect to this point. *See State v. Preciose*, 129 *N.J.* 451, 462, 609 *A.*2d 1280 (1992).

Affirmed.