## Commonwealth vs. Kathleen Hilton.

Essex. November 4, 2004. - March 9, 2005.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Homicide. Burning a Dwelling House. Fire Fighter. Constitutional Law,* Admissions and confessions, Waiver of constitutional rights, Assistance of counsel. *Evidence,* Admissions and confessions, Voluntariness of statement. *Practice, Criminal,* Capital case, Admissions and confessions, Voluntariness of confession, Assistance of counsel. *Due Process of Law,* Police custody, Assistance of counsel. *Correction Officer.*

The judge hearing a criminal defendant's motion to suppress evidence of statements she made to police officers correctly concluded that the Commonwealth failed to prove the validity of the defendant's waiver of her Miranda rights, where the judge properly gave considerable weight to the nature and extent of the defendant's mental impairment while not treating it as automatically conclusive of the invalidity of her waiver, and where the judge addressed the defendant's understanding of the Miranda warnings themselves in concluding that the defendant did not understand her legal rights during her interrogation by the police [604-607]; moreover, because the judge grounded his decision to suppress the defendant's statement on his conclusion that the Commonwealth had not proved a valid waiver of Miranda rights, his erroneous conclusion that the ensuing statement was not voluntarily made was harmless [607-608].

The judge hearing a criminal defendant's motion to suppress evidence of statements she made to police officers during an interrogation erred in concluding that all of the interrogation was custodial in nature, where, until the latter stages of questioning after the defendant had made her initial confession, the evidence would not support the conclusion that a reasonable person in the defendant's position would have believed she was in custody; rather, the setting became custodial only when an additional officer joined the interrogation to engage in detailed questioning of the defendant about the particulars of the crime, with the defendant as the evident focal point of the investigation after her more general confession, and the judge properly suppressed statements that the defendant made after that point, on the ground that the Commonwealth had failed to prove the validity of the defendant's waiver of her Miranda rights. [608-613]

This court concluded that a court officer was an agent of law enforcement for purposes of determining whether questions that a court officer posed to a criminal defendant without the defendant's attorney present constituted efforts by a government agent deliberately to elicit incriminating statements from the defendant in violation of her right to counsel under the Sixth Amendment to the United States Constitution. [613-617]

The judge hearing a criminal defendant's motion to suppress evidence of statements she made to a court officer without her attorney present correctly concluded that the defendant's initial remarks to the court officer were not the product of any questioning or interrogation, nor of any action by the court officer deliberately to elicit incriminating statements from the defendant, but that the court officer's subsequent questions to the defendant were specific questions about the crime that were reasonably likely to elicit an incriminating response from the defendant, and therefore violated the defendant's right to counsel under the Sixth Amendment to the United States Constitution. [617-619]

INDICTMENTS found and returned in the Superior Court Department on March 10, 1999.

A pretrial motion to suppress evidence was heard by *Isaac Borenstein*, J.

Applications for leave to prosecute interlocutory appeals were allowed by *Sosman*, J., in the Supreme Judicial Court for the county of Suffolk, and the case was reported by her to the Appeals Court. The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Marcia H. Slingerland*, Assistant District Attorney (*David Dunbar Livingston*, Assistant District Attorney, with her) for the Commonwealth.

*Michael F. Natola* for the defendant.

SOSMAN, J. The defendant has been indicted on charges of murder in the second degree (five counts), burning a dwelling (G. L. c. 266, § 1), and causing injury to a fire fighter (G. L. c. 265, § 13D ½). The defendant moved to suppress her statement to the police (in which she ultimately made a full confession) and her later statement to a court officer following her arraignment (in which she confirmed that she had lit the fire in question). After an evidentiary hearing, the motion judge concluded that the police interrogation of the defendant was custodial in nature, and suppressed the entirety of her statement on the ground that the Commonwealth had failed to prove that the defendant's waiver of her Miranda rights was knowing, intelligent, and voluntary. With respect to the defendant's statements to the court officer, the judge denied the motion to suppress the defendant's initial spontaneous remarks, as they were not the product of any improper questioning, but suppressed the

defendant's answers to subsequent specific questions on the ground that the court officer had posed those questions in derogation of the defendant's right to counsel under the Sixth Amendment to the United States Constitution.

Both the Commonwealth and the defendant were granted leave to appeal the judge's decision, and we transferred the case to this court on our own motion. With respect to the defendant's statement to the police, we hold that the judge erred in concluding that the interrogation was custodial at its inception, and therefore reverse the ruling insofar as it suppressed the statements made during the initial noncustodial phase of the interview. We see no error in the judge's finding that the defendant's mental infirmities were such that she did not understand the Miranda warnings, and we therefore conclude that statements made after the interrogation did become custodial were properly suppressed. We find no error in the partial suppression of the statements made to the court officer, and therefore affirm that portion of the judge's ruling.

1. *Facts.* The motion judge's detailed findings of fact are summarized as follows. At 10:57 P.M. on February 24, 1999, the Lynn fire department responded to an alarm at a three-family dwelling. Five people were killed in the blaze. Suspicion initially centered on the defendant's son, Charles Loayza. Loayza's estranged girl friend, Krystina Sutherland, and their two children lived in the building; Loayza had argued with Sutherland that very afternoon and had threatened to burn the building; and Loayza had set fire to a wreath on the door of Sutherland's apartment just two months earlier.

At approximately 2:15 A.M. on February 25, Sergeant Michael Cronin of the State police, accompanied by a Lynn police captain, went to the defendant's apartment (approximately one-quarter mile from the scene of the fire) attempting to locate Loayza. Cronin informed the defendant that they were investigating a fire, told her they were looking for her son, and asked her some questions about him. The defendant told them that Loayza lived with her; that he had recently broken up with Sutherland; that he had been upset that evening after speaking with Sutherland on the telephone; and that he had left the apartment to go to work at approximately 7:30 P.M. This interview of the defendant lasted approximately twenty minutes.

A few hours later, still unable to locate Loayza, Cronin returned to the defendant's apartment and asked her to come to the police station for further questioning concerning her son. She voluntarily accompanied him to the station, where she was questioned by Cronin and a Lynn police detective. As with the initial interview, the focus of the questioning pertained to Loayza's whereabouts and the police suspicion that Loayza was responsible for the fire. The defendant insisted that Loayza would not have lit the fire, because he would not have wanted to hurt his own children. She again described Loayza's telephone call to Sutherland the previous evening, which he had made in order to speak to the children. She reiterated that Loayza had been extremely upset after that call, crying and fearful that he would never see his children again, and expressing thoughts of killing himself. At the end of the interview (which lasted a little more than one-half hour), the police drove the defendant back to her apartment.

Thereafter, the police found Loayza and arrested him on an outstanding warrant unrelated to the fire. Loayza provided an account of his whereabouts on the night of the fire, and the police were able to confirm his alibi. The police also received information that the defendant herself may have been involved in setting other fires, and the investigation therefore shifted its focus from Loayza to the defendant.

On the afternoon of February 27, Cronin returned to the defendant's apartment, this time accompanied by a State trooper. They were in plain clothes and driving an unmarked vehicle. They asked the defendant to come to the police station again and give a further statement. The defendant agreed, and was driven to the station and taken to the same interview room where she had been questioned two days earlier. She was left on her own for approximately five minutes. Cronin then returned, accompanied by the same police captain who had been with him when the defendant was first questioned at her home on the night of the fire.

At the outset of the interview, Cronin advised the defendant of her Miranda warnings, reading them off of a sheet; she said that she understood the warnings, and all three signed the sheet. The interview began along the same lines as the earlier

interview, with questions concerning Loayza and the information the defendant had previously given to the police. Cronin did not inform the defendant that Loayza had an alibi and was no longer a suspect, nor did he advise her that she had become a suspect herself. The defendant stated that after Loayza left for work on the night of the fire, she stayed home watching television. When she heard sirens and saw blue lights, she went outside, saw the smoke, and realized that Sutherland's house was on fire. She ran to the scene and asked an officer if her grandchildren had escaped the blaze. She then saw the children as they were being put into an ambulance, and she rode in the ambulance with them to the hospital. From the hospital, she walked home.

Approximately fifty minutes into the interview, the defendant asked to use the bathroom. They took a break, and a female trooper escorted the defendant to the bathroom.[1] When questioning resumed, Cronin began to ask the defendant about two other fires. She denied any involvement in those other incidents. Cronin asked her again about her son's relationship with Sutherland. In her response, the defendant stated that she was angry over the way Sutherland had treated her son. She stated that she had not started the fire, explaining that she only went to the scene when she saw the smoke. Cronin asked the defendant what she thought should happen to the person who did set the fire, to which the defendant replied that that person should apologize to Loayza, and she then opined that the person who did it might not have meant to. This portion of the questioning lasted approximately one hour and fifteen minutes, at which time the officers and the defendant took a ten-minute break.

When they resumed, the officers suggested to the defendant that there was a "possibility" that she had set the fire. The defendant adamantly rejected that suggestion, pointing out that she had no reason to set the fire and would not do anything to hurt her own grandchildren. She said that she did not know who

---

[1]The judge referred to the trooper as "armed" at the time of this escort. There was testimony that "most" of the "officers or detectives" in the area of the interview room were armed, but no testimony as to whether the female trooper was armed, nor evidence as to whether any such weapon would have been carried in a manner visible to the defendant. There was also no evidence as to whether the female trooper was in uniform or in plain clothes.

started the fire, but that neither she nor her son had done so. The officers then took another brief break to discuss how they were going to proceed.[2]

When the interview resumed, the defendant appeared very upset. The officers adopted a sympathetic tone, suggesting that it would be "better" if the defendant told them exactly what happened. The defendant then said that her "babies" had been hurt enough, and that her son would hate her and never forgive her. Cronin suggested that she just "tell [them] what happened." At that point, the defendant said that she had started the fire using a lit cigarette and some oil thrown on the stairway. She explained that her hope had been that if Sutherland had nowhere to stay, Sutherland and the children would return to Loayza.

The interrogating officers left briefly to get State Trooper Kevin Condon from the fire marshal's office, as he was familiar with the forensic evidence concerning the origin and nature of the fire. Condon introduced himself to the defendant, and Cronin explained to her that Condon investigated fires. The defendant then related in detail how she started the fire, with Condon asking specific questions about those details. Condon also drew a diagram of the building, and asked the defendant to supply specific information to be placed on the diagram. In addition to providing details about how and where she started the fire, the defendant further described her motive, explaining that Sutherland had treated Loayza badly, and that Sutherland was not a good mother. The defendant expressed relief that the children had not been hurt in the fire, and stated that she had not known that there were other children on the top floor of the building.[3] After another brief break, there was further questioning by Condon in the same vein concerning the details of the fire itself. The defendant's statement was reduced to writing, and the defendant reviewed and signed it. At the conclusion, the defendant was arrested and booked. The entire interrogation lasted approximately three hours.

---

[2]According to the testimony, this break lasted approximately five minutes, with the officers leaving the defendant alone in the interview room while they conversed elsewhere.

[3]From the context of those statements and the defendant's later statement to the court officer, it appears that the victims who perished in the fire had been on the top floor.

The judge found that throughout those three hours, the tenor of the questioning had been "low-key and sympathetic to the defendant." He credited the officers' testimony to the effect that the defendant, although at times going off on tangents during questioning, was "generally coherent and rational" and answered questions "appropriately." However, the judge also credited expert testimony proffered by the defense concerning the defendant's significant mental impairments. Specifically, he found that the defendant is mildly mentally retarded, functionally illiterate, and given to "delusional and bizarre thinking." She has "a tenuous connection to reality, poor judgment, and a tendency to misinterpret events and their meaning," with "little ability to understand abstract concepts." He credited the experts' diagnoses that the defendant suffers from schizophrenia and has a schizotypal personality disorder.

The defendant was arraigned on March 1, 1999, in the Lynn division of the District Court department.[4] On duty that day was court officer Susan Marrin, whose job responsibilities included the transportation of detainees between the holding cells and the court room, maintaining order in the court room, and providing security for the judges and the public. As a court officer, she did not work for or report to the State police, the fire marshal, the district attorney's office, or the Lynn fire department. As part of her duties, however, she was to report to either her supervisor or to the police any criminal activity she observed in and around the court house.

After the defendant's arraignment, Marrin was escorting the defendant back to the holding area. On the way, the defendant began to complain about her leg irons, and told Marrin that her

[4]The defendant was examined that day by the court's forensic psychiatrist, who concluded that there was a question as to the defendant's competency to stand trial and recommended that the defendant be hospitalized pursuant to G. L. c. 123, § 15B. The same psychiatrist examined the defendant with respect to her competency later that same month, when she was arraigned in the Superior Court. He again expressed concern that she may lack the ability to consult with her lawyer, and again recommended that she be hospitalized. At the time of the evidentiary hearing the following year, defense counsel assured the judge that he had no difficulty communicating with the defendant and that there was no issue as to her competence to proceed with the hearing on the motion to suppress. The issue of the defendant's competency is not before us.

son had warned her that leg irons hurt and were "no good." Marrin asked who her son was, and the defendant explained that he had been in the court house the previous week. She then stated, "I hope he forgives me." Marrin, reacting in surprise, said, "Excuse me?" The defendant responded, "My son, I hope he forgives me. I could have killed my grandchildren." Marrin then asked the defendant if she had lit the fire, and the defendant said that she had. Marrin asked her why she had done it, and the defendant explained that she (Marrin) did not know what "that woman" had done to her son. Marrin asked the defendant about the people on the third floor, to which the defendant replied that she had not known that anyone was on the third floor. After delivering the defendant to the holding cell, Marrin went to report this conversation to her supervisor. However, on the way, she encountered a Lynn police officer who was working on the case, informed him of the conversation she had had with the defendant, and went to the police station to give a detailed statement concerning that conversation.

2. *Discussion.* a. *Statement to the police.* The motion judge concluded that, from the outset of the February 27 interview at the station, the defendant was in custody. Although the officers gave the defendant Miranda warnings before questioning her, the judge concluded that the defendant's mental illness and impairments were such that the Commonwealth had not met its burden of proving that the defendant "understood her legal rights and knowingly and intelligently waived them." He simultaneously concluded that the defendant's statement to the police was made voluntarily in the sense that it was not coerced by either the police or by the effects of her mental illness. However, because of the judge's conclusion that the defendant's waiver of Miranda rights was not "knowing and intelligent," he decided that the resulting statement was not the product of a "rational intellect" and therefore not voluntary. He thus suppressed the entirety of the defendant's statement to the police. On appeal, the Commonwealth contends that the judge applied the wrong legal standard to his analysis of the validity of the defendant's waiver of her rights and the voluntariness of her statement. The Commonwealth also contends that the issue of the defendant's waiver of Miranda rights does not need to be

reached with respect to at least a portion of the defendant's statement, as the interrogation did not become custodial until some point after the defendant confessed to the crime. We consider each argument in turn.

i. *Validity of the waiver.* If an interrogation is custodial in nature, the Commonwealth bears the burden of proving beyond a reasonable doubt that the defendant made a valid waiver of Miranda rights. *Commonwealth* v. *Rodriguez*, 425 Mass. 361, 366 (1997). *Commonwealth* v. *Edwards*, 420 Mass. 666, 669-670 (1995). We give substantial deference to the motion judge's determination of the validity of a waiver, and will not reject the judge's subsidiary findings if warranted by the evidence. *Commonwealth* v. *Mandile*, 397 Mass. 410, 412 (1986), quoting *Commonwealth* v. *Benoit*, 389 Mass. 411, 419 (1983). However, we conduct an independent review to determine whether the judge properly applied the correct legal principles to those findings. *Commonwealth* v. *Rodriguez, supra* at 364.

To be valid, the waiver of Miranda rights must be made knowingly, intelligently, and voluntarily. *Commonwealth* v. *Edwards, supra* at 669. The validity of a waiver is assessed in light of the totality of the circumstances, which includes, inter alia, "the defendant's age, education, intelligence and emotional stability." *Commonwealth* v. *Rodriguez, supra* at 366, quoting *Commonwealth* v. *Mandile, supra* at 413. Here, the factor that was of the greatest concern to the motion judge was the nature and extent of the defendant's mental impairment. In light of the evidence before him, the judge properly gave considerable weight to that factor. A judge must give "special attention" when confronted with a waiver of rights by a person who suffers from mental deficits. *Commonwealth* v. *Hartford*, 425 Mass. 378, 381 (1997). See *Commonwealth* v. *Cameron*, 385 Mass. 660, 664 (1982) (reviewing court considering suspect's waiver of rights must also "scrutinize record with special care when the suspect has a diminished or subnormal mental capacity"). "[M]ental illness is certainly a factor that a trial court should consider when deciding on the validity of a waiver. If a defendant cannot understand the nature of his rights, he cannot waive them intelligently." *Miller* v. *Dugger*, 838 F.2d 1530, 1539 (11th Cir.), cert. denied, 486 U.S. 1061 (1988).

The Commonwealth correctly observes that the mere existence of mental impairments does not automatically preclude a knowing and intelligent waiver of rights. See, e.g., *Commonwealth* v. *Jackson*, 432 Mass. 82, 87 (2000); *Commonwealth* v. *Prater*, 420 Mass. 569, 578-579 (1995); *Commonwealth* v. *Libran*, 405 Mass. 634, 638-639 (1989); *Commonwealth* v. *Medeiros*, 395 Mass. 336, 347 (1985). The judge understood that the defendant's mental illness was not necessarily determinative, citing in his opinion the same precedent that the Commonwealth cites in its brief. Nothing in the judge's opinion suggests that he erroneously treated the defendant's mental illness as automatically conclusive of the invalidity of her waiver.

The Commonwealth also contends that the judge imposed too high a standard in terms of what a suspect must understand and appreciate in order to make a knowing and intelligent waiver. For example, the Commonwealth claims that the judge's analysis improperly focused on the defendant's lack of concern for herself and her desire to protect her son, rather than on her ability to understand her Miranda rights. In order for a waiver to be "knowing" and "intelligent," the defendant must understand "the [Miranda] warnings themselves," but does not need to understand or appreciate the tactical or strategic consequences of waiving Miranda rights. *Commonwealth* v. *Raymond*, 424 Mass. 382, 393 (1997), citing *Colorado* v. *Spring*, 479 U.S. 564, 567-577 (1987). See *Commonwealth* v. *Cunningham*, 405 Mass. 646, 656-657 (1989) (failure to appreciate legal ramifications of admitting role as joint venturer while identifying another as actual perpetrator did not render waiver of Miranda rights invalid on theory that waiver was not "intelligent"); *Commonwealth* v. *Lee*, 10 Mass. App. Ct. 518, 529-530 (1980) (defendant's "understanding" of Miranda warnings refers to "comprehension of the rights guaranteed to him," not to defendant's "appreciation of the legal ramifications of his waiver"). "[T]he law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances — even though the defendant may not know the *specific detailed* consequences of invoking it" (emphasis in original). *United States* v. *Ruiz*, 536 U.S. 622, 629 (2002).

Here, the judge did observe that the defendant's mental illness affected her ability to understand the consequences of her waiver. At the same time, he noted that the defendant had difficulty understanding abstract legal concepts. For example, the defendant was unable to grasp such concepts when she was examined for competency to stand trial — the defendant did not understand the roles of the various participants at trial, and was still unable to do so after the examiner explained them to her repeatedly.[5] Nor, despite repetition, did the defendant appear to comprehend the *Lamb* warnings. See *Commonwealth* v. *Lamb*, 365 Mass. 265, 270 (1974). The judge thus concluded that the defendant did not understand "her legal rights" during her interrogation by police. That conclusion addresses the correct issue, namely, the defendant's understanding of the Miranda warnings themselves. To the extent that the judge also considered the defendant's inability to appreciate the consequences and ramifications of the confession that she gave, that consideration was at worst superfluous. It does not undermine his conclusion, adequately supported by the record, that she did not understand her rights. We thus see no reason to disturb the judge's conclusion that the Commonwealth failed to prove the validity of the defendant's waiver of Miranda rights.

ii. *Voluntariness.* The validity of a waiver (which must be knowing, intelligent, and voluntary) is a separate inquiry from whether the ensuing statement itself was voluntarily made. See *Commonwealth* v. *Williams*, 388 Mass. 846, 851 n.2 (1983), and cases cited. With respect to the voluntariness of the defendant's statement, the judge found that the statement was not the product of the defendant's mental illness, that she had been coherent and rational during the course of the interrogation, and that there had been no coercion or unfair interrogation tactics

---

[5]The Commonwealth contends that the defendant's inability to understand explanations given to her during her competency examination was irrelevant, because the issues are completely different from Miranda rights. That the concepts being explained were different does not undermine the relevance of what occurred during the competency examination. The defendant's inability to comprehend such matters as the role of the judge and jury, even with repeated explanation, was highly probative as to whether she would have understood Miranda warnings that were merely read to her a single time with no further explanation.

employed by the police. The judge saw no evidence that her "will was overborne" or that "her statement was not a free and voluntary act." These findings signify that the Commonwealth had met its burden with respect to the issue of voluntariness.

However, because the defendant had not knowingly and intelligently waived her Miranda rights, the judge concluded that her statement was not "the product of a rational intellect" and, in that sense, not "voluntary." When our cases have spoken of voluntariness in terms of a defendant's "rational intellect," we have done so to contrast a statement that is the product of a defendant's mental illness or incapacity. See, e.g., *Commonwealth* v. *Benoit*, 410 Mass. 506, 511 (1991), quoting *Commonwealth* v. *Allen*, 395 Mass. 448, 455 (1985) (statements "attributable in large measure to a defendant's debilitated condition, such as insanity . . . are not the product of a rational intellect or free will and are involuntary"). See also *Commonwealth* v. *Hunter*, 416 Mass. 831, 834 (1994). Here, the judge expressly found that the defendant's statement was *not* the product of her mental illness. Her lack of comprehension of the Miranda warnings would not, by itself, taint the voluntariness of her statement. The judge ultimately grounded his decision to suppress the defendant's statement on his conclusion that the Commonwealth had not proved a valid waiver of Miranda rights, a conclusion that is amply supported by the record and the judge's subsidiary findings, and not on grounds of involuntariness, a conclusion that would not be supported by the record or the judge's subsidiary findings. Based on those findings that were germane to the issue of voluntariness, the Commonwealth had established that the defendant's statement was voluntarily made.

iii. *Custodial interrogation.* Finding no error in the judge's determination that the Commonwealth failed to prove a valid waiver of Miranda rights, we must address the Commonwealth's contention that the judge erred in concluding that the interrogation of the defendant was custodial in nature. The requirements of *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966), are not triggered unless the interrogation is custodial, and a defendant's failure to receive or understand Miranda warnings, or police failure to honor Miranda rights, does not result in suppression

of a voluntary statement made in a noncustodial setting. See *Commonwealth* v. *Bryant*, 390 Mass. 729, 736, 742 (1984); *Commonwealth* v. *King*, 387 Mass. 464, 474 (1982); *Commonwealth* v. *Bookman*, 386 Mass. 657, 661 n.5 (1982); *Commonwealth* v. *Barnes*, 20 Mass. App. Ct. 748, 749, 752 (1985). Thus, the fact that the defendant did not grasp the meaning of the *Miranda* warnings would not result in suppression of her voluntary statement unless the questioning occurred in a custodial setting. For these purposes, the defendant bears the burden of proving that she was in custody. *Commonwealth* v. *Larkin*, 429 Mass. 426, 432 (1999), citing *United States* v. *Charles*, 738 F.2d 686, 692 (5th Cir. 1984). The Commonwealth contends that, until the latter stages of questioning after the defendant made her initial confession, the evidence would not support the conclusion that the defendant was subjected to custodial interrogation. We agree.

In assessing whether a defendant was in "custody" for purposes of the *Miranda* requirements, "[t]he crucial question is whether, considering all the circumstances, a reasonable person in the defendant's position would have believed that he was in custody. . . . Thus, if the defendant reasonably believed that he was not free to leave, the interrogation occurred while the defendant was in custody, and *Miranda* warnings were required" (citations omitted). *Commonwealth* v. *Damiano*, 422 Mass. 10, 13 (1996). In making that determination, we consider various factors: "(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview ended with an arrest." *Commonwealth* v. *Groome*, 435 Mass. 201, 211-212 (2001), citing *Commonwealth* v. *Morse*, 427 Mass. 117, 121-127 (1998), and *Commonwealth* v. *Bryant*, 390 Mass. 729, 737 (1984).

The fact that the defendant's interview occurred at the police

station is not, by itself, dispositive. See *Commonwealth* v. *Gil,* 393 Mass. 204, 212 (1984), quoting *Commonwealth* v. *Bookman,* 386 Mass. 657, 660 (1982). The defendant voluntarily accompanied the police to the station. Her interview just two days earlier had been conducted at the same station (indeed, in the very same room), and she had left the station at the conclusion of that earlier interview without being arrested. Upon her arrival at the station on the day she made her confession, she was left by herself in the interview room. Although the police were suspicious of the defendant's possible involvement in the fire, they did nothing to convey any such suspicion at the start of the interview. The police had by then eliminated Loayza as a likely suspect based on his alibi, but that change in Loayza's status was never communicated to the defendant, nor was she apprised of her son's alibi. The defendant previously had been led to believe that the police viewed Loayza as the likely perpetrator, and their prior questioning had reflected their interest in finding out more about her son. From the defendant's perspective, the same appeared to be the case with respect to the initial phases of the interview of February 27.[6] The tone and style of the questioning, according to the judge's findings, was neither aggressive nor confrontational. There is nothing on this record to suggest that the questioning of the defendant started out as a custodial interrogation.[7]

The Commonwealth concedes that the interrogation ultimately became custodial. The issue is when that change occurred. The defendant places great significance on the fact that when she asked to use the bathroom after approximately fifty minutes of questioning, she was accompanied to the bathroom by a female trooper. We reject the argument that that escorted trip to the

---

[6]Indeed, the defendant's affidavit in support of the motion to suppress explained that she was upset during police questioning because she "believed that [her] son was being accused of setting the fire." She similarly claimed to her own experts that she ultimately confessed because the police were pressuring her to implicate her son.

[7]That Miranda warnings were given to the defendant does not make the interrogation custodial. See *Commonwealth* v. *Lawrence,* 404 Mass. 378, 386 (1989), and cases cited. Indeed, we have encouraged police to give Miranda warnings prior to the point at which an encounter becomes custodial rather than "wait until the exact moment when the warnings are constitutionally required." *Commonwealth* v. *Raymond,* 424 Mass. 382, 393 n.9 (1997).

bathroom, by itself, transformed the interview into a custodial interrogation.

The uncontroverted testimony was that the escort was not provided for purposes of preventing the defendant from leaving the station, but rather for purposes of direction and privacy. The officers explained that the defendant needed to be shown where the bathroom was and, because it was a unisex bathroom used primarily by male officers, the female trooper was asked to accompany the defendant to make sure that the men remained away from the bathroom while the defendant used it. At the time of this trip to the bathroom, the officers did not have probable cause to arrest the defendant, and knew that they did not have sufficient grounds to detain her. And, up to that point in the interview, their questioning still had not communicated to the defendant that she was under suspicion. Rather, the focus had remained where it had been during the two prior encounters, namely, questioning the defendant about her son and his relationship to Sutherland. From the defendant's perspective at that point in the interview, the police still appeared suspicious of her son, not of her. When questioning resumed after the trip to the bathroom, the judge found that the officers "kept the interview low-key and acted sympathetic toward the defendant." The mere fact that a female officer had just gone with her to the bathroom would not have made the defendant feel that she was prohibited from leaving.

During the next phase of the interview, the officers began to reveal some degree of suspicion concerning the defendant, although they stopped short of an outright accusation. When they suggested the "possibility" that she may have set the fire, the defendant denied any such suggestion, explaining that she would not have done anything to hurt her own grandchildren. The officers then took another break and left the defendant by herself in the interview room for approximately five minutes. At that juncture, the officers still lacked grounds to arrest the defendant, left her on her own, and did nothing that would suggest she was not free to leave.

The defendant's confession began during the next segment of the interview, in response to the officer's "sympathetic" suggestion that she "tell [them] what happened." As a suspect makes

incriminating statements, a previously noncustodial setting can become custodial — a person who has just confessed to a crime would reasonably expect that she was no longer free to leave. See *Commonwealth* v. *Alicea*, 376 Mass. 506, 509, 513 (1978); *Commonwealth* v. *Cruz*, 373 Mass. 676, 683-684 (1977). However, an interview does not automatically become custodial at the instant a defendant starts to confess. See *Miranda* v. *Arizona*, 384 U.S. 436, 478 (1966) (police not required to "stop a person who enters a police station and states that he wishes to confess to a crime"); *Commonwealth* v. *Bryant*, 390 Mass. 729, 738-742 (1984). "[T]here is no requirement that officers interrupt a suspect in the course of making a volunteered statement to recite the *Miranda* warnings." *State* v. *Tucker*, 81 Ohio St. 3d 431, 438 (1998). See *Bowman* v. *Peyton*, 287 F. Supp. 863, 864-865 (W.D. Va. 1968). In *Commonwealth* v. *Bryant, supra* at 733, the defendant blurted out that he had committed the crime ("I did it, I shot him") while talking with a police officer at the defendant's home, and, after a brief pause and the officer's asking the defendant "if he would like to tell me about it," proceeded to make a detailed confession. The setting had been noncustodial, but the defendant argued that that first inculpatory remark operated to change the encounter to a custodial interrogation. We rejected the argument. Although the statement, "I did it, I shot him," immediately gave the officer probable cause to arrest, and the officer presumably would not have honored any request by the defendant that he leave, the issue was whether anything had resulted in a "fundamental transformation in the atmosphere of the defendant's home in the fifteen seconds between the defendant's initial statement and the more detailed confession." *Id.* at 738-739. We refused to "freeze-frame" the encounter at the moment of the initial inculpatory statement, but rather looked to whether the giving of that statement had resulted in some difference in how the defendant was treated and questioned. *Id.*

Here, we similarly decline to "freeze-frame" the instant when the defendant first made an inculpatory remark to the effect that her son would hate her and never forgive her. The officer's suggestion ("Why don't you tell us what happened?"), made immediately after that remark, did not result in any "fundamental

transformation in the atmosphere" that had preceded it. *Id.* at 739. The defendant's confession proceeded, without any change in the tenor of the questioning or any apparent change in her status. Indeed, following that initial confession, the officers again left her alone while they went to get Trooper Condon.

The setting became custodial when Condon was brought into the room and began to question the defendant about the particulars of how she had lit the fire. Condon was introduced to the defendant as someone with expertise in investigating fires, and his questions were based on specific forensic evidence concerning this particular fire. This kind of detailed questioning, with the defendant as the evident focal point of the investigation after her more general confession, transformed the previously sympathetic and nonaccusatory interview into a custodial interrogation. Not surprisingly, that interrogation culminated in the defendant's formal arrest.

We therefore conclude that the judge erred in suppressing statements made by the defendant prior to Condon's arrival, as the defendant failed to demonstrate that she was subjected to custodial interrogation until that time. On Condon's involvement in the questioning, the interrogation became custodial in nature, thus triggering the requirement that the defendant be given Miranda warnings and make a knowing, intelligent and voluntary waiver of Miranda rights. Where the Commonwealth has failed to meet its burden of proving a knowing and intelligent waiver of rights, the defendant's statements made in the final phase of the interview were properly suppressed.

b. *Questioning by the court officer.* With respect to the statements made by the defendant to court officer Marrin, the motion judge held that Marrin was "a government official in an enforcement status with respect to the defendant," that her initial remarks to the defendant were not the functional equivalent of interrogation, but that Marrin should have known that her subsequent express questions about the fire were likely to elicit an incriminating response. The judge therefore found no violation of the defendant's Sixth Amendment right to counsel with respect to the defendant's initial remarks to Marrin, but suppressed the defendant's responses to Marrin's specific questions. On appeal, the Commonwealth claims that

the judge erroneously classified Marrin as an "agent of the police" and that he therefore erred in suppressing any of the defendant's statements to Marrin on Sixth Amendment grounds. On the other side, the defendant contends that the judge erred in failing to treat the entire exchange as improper interrogation in violation of the Sixth Amendment.[8] We see no error, and affirm the judge's ruling suppressing portions of the defendant's statements to Marrin.

The Commonwealth acknowledges that the defendant's Sixth Amendment rights had attached by the time of her conversation with Marrin. The Sixth Amendment guarantees an accused the right to the assistance of counsel after formal adversary proceedings have begun. *Brewer* v. *Williams*, 430 U.S. 387, 401 (1977). *Massiah* v. *United States*, 377 U.S. 201, 206 (1964) (*Massiah*). Once Sixth Amendment rights have attached, government agents may not "deliberately elicit[]" statements from a defendant without his lawyer present. *Massiah, supra.* See *Kuhlmann* v. *Wilson*, 477 U.S. 436, 457 (1986); *United States* v. *Henry*, 447 U.S. 264, 270, 271 (1980). This principle not only prohibits direct interrogation of a defendant, but more generally prohibits any "knowing exploitation by the State of an opportunity to confront the accused without counsel being present." *Maine* v. *Moulton*, 474 U.S. 159, 176 (1985). See *United States* v. *Henry, supra* at 274 (Sixth Amendment violated by government's "intentionally creating a situation likely to induce [the defendant] to make incriminating statements without the assistance of counsel"). The Sixth Amendment thus imposes on law enforcement an "obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Maine* v. *Moulton, supra* at 171.

The Commonwealth contends that because a court officer's job is not "to investigate or enforce the law for the police," a court officer is not "an instrument or agent of the police," and questioning by a court officer would therefore not violate the Sixth Amendment. The Commonwealth's argument mistakenly assumes that *Massiah* and its progeny only prohibit questioning

---

[8]Neither party has made any separate argument under art. 12 of the Declaration of Rights of the Massachusetts Constitution, and we therefore do not address it.

by "the police" or agents of "the police." In cases involving direct questioning by "police" or by informants allegedly recruited by "police," we have sometimes referred to the Sixth Amendment as prohibiting questioning by "the police" and their agents. See, e.g., *Commonwealth* v. *Rainwater*, 425 Mass. 540, 544 (1997), cert. denied, 522 U.S. 1095 (1998) (describing what Sixth Amendment allows "police" to do in case involving police questioning of represented defendant); *Commonwealth* v. *Allen*, 395 Mass. 448, 454 (1985) (noting that hospital nurse who obtained information from defendant was not acting "on behalf of the police"); *Commonwealth* v. *Rodwell*, 394 Mass. 694, 698-699 (1985) (no Sixth Amendment barrier to admission of statements made to private citizen in absence of "police connection with the private citizen"). These references do not mean that the Sixth Amendment's protections are implicated only by actions involving the "police," but merely operate to describe the most common fact pattern raised by such cases.

Once the Sixth Amendment right to counsel has attached, the *Massiah* line of cases more broadly prohibits *"government efforts* to elicit information from the accused" (emphasis added), *Michigan* v. *Jackson*, 475 U.S. 625, 630 (1986), including interrogation by *"the government* or someone acting on its behalf" (emphasis added), *United States* v. *LaBare*, 191 F.3d 60, 64 (1st Cir. 1999), citing *Kuhlmann* v. *Wilson, supra* at 459. The concern is not merely with the actions of the police themselves, but with "secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Kuhlmann* v. *Wilson, supra* at 459. Courts have sometimes characterized the scope of this prohibition as extending to questioning by a State or government "official" or an agent of such an "official." See, e.g., *Depree* v. *Thomas*, 946 F.2d 784, 794 (11th Cir. 1991); *Thomas* v. *Cox*, 708 F.2d 132, 136 (4th Cir.), cert. denied, 464 U.S. 918 (1983). We have at times characterized it as a prohibition directed at "law enforcement" officials and their agents. See *Commonwealth* v. *Rancourt*, 399 Mass. 269, 273 (1987) (where fellow inmate was "not an agent of any law enforcement official," his questioning of defendant did not violate Sixth Amendment); *Commonwealth* v. *Allen, supra* at 454 (*Massiah* prohibits deliberate elicitation of information by "law

enforcement officials," but does not affect gathering of information by private citizens "unconnected with law enforcement authorities"). Overall, the issue is whether the questioning of the defendant "has to be considered governmental interrogation." *Commonwealth* v. *Rancourt, supra,* quoting *United States* v. *Surridge,* 687 F.2d 250, 252 (8th Cir.), cert. denied, 459 U.S. 1044 (1982).

The present case asks us to address the status of court officers for Sixth Amendment purposes under *Massiah.*[9] Court officers have charge of detained defendants at the court house, and provide security for the court house premises, personnel, and the public. Although court officers do not work for the State or local police, they may exercise police powers: "Court officers and those authorized to act as court officers within the judicial branch may perform police duties and have police powers in or about the premises of the court or in the immediate vicinity thereof when so designated by the chief administrative justice." G. L. c. 221, § 70A. Court officers wear a uniform and a badge. Here, Marrin was required to report any observations or information concerning criminal activity, and, on hearing the defendant's incriminating remarks, immediately undertook to report what she had learned.[10] The police officer to whom she reported asked her to come to the police station to give a state-

[9]We need not address the status of other types of State employees or other types of court house personnel. The application of Sixth Amendment principles to other government employees has yielded mixed results. See *Commonwealth* v. *Bandy,* 38 Mass. App. Ct. 329, 333 & n.4 (1995) (assuming, without deciding, that probation officer was law enforcement agent for purposes of Sixth Amendment analysis); *United States* v. *Jackson,* 886 F.2d 838, 844 (7th Cir. 1989) (Federal probation officer conducting presentence interview is "an extension of the court and not an agent of the government" for Sixth Amendment purposes); *State* v. *Nations,* 319 N.C. 318, 320-321, 325 (1987) (interview of defendant at prison by supervisor of protective services at State social service agency not prohibited by Sixth Amendment where supervisor had no affiliation with "law enforcement agency" and had not acted at behest of "any law enforcement agency"); *State* v. *Bey,* 258 N.J. Super. 451, 467-468 (1992) (correction officer is "law enforcement agent").

[10]While the Commonwealth stresses that Marrin was intending to report to her supervisor rather than to the police, Marrin herself testified that she was obligated to report *either* to the police or to her "bosses." On the way to report to her supervisor concerning her conversation with the defendant, she instead reported to a police officer working on the case whom she happened to encounter first.

ment about the defendant's remarks and, with her supervisor's permission, she went to the station for that purpose during the hours she was on duty as a court officer. A court officer's job duties and official powers thus include attributes of law enforcement, and Marrin's report to the police was similarly infused with law enforcement as its primary purpose. See *State* v. *Bey*, 258 N.J. Super. 451, 467-468 (1992) (where statute conferred police powers on correction officers, who were encouraged to speak with prisoners to detect suicide risk, correction officer was "law enforcement agent" for purposes of Sixth Amendment).

Beyond any technical analysis of whether a court officer is an agent of "law enforcement," we are also cognizant that allowing court officers to question defendants concerning the crimes with which they are charged would operate to "circumvent[] and thereby dilute[] the protection afforded by the right to counsel." *Maine* v. *Moulton*, 474 U.S. 159, 171 (1985). Court officers regularly interact with defendants without counsel present, and must do so as part of the ordinary process of escorting them to and from the courtroom and overseeing their welfare while in the holding cells. And, by virtue of their presence in the court room during ongoing proceedings, court officers regularly become aware (as did Marrin) of the nature of the pending charges and the specific evidence against a defendant. The right to the assistance of counsel would be seriously "dilute[d]," *id.*, if court officers could, on their own initiative, question defendants about their pending cases and then turn a defendant's incriminating responses over to the police and prosecutor. The command of *Massiah* and its progeny is that we not tolerate interrogation practices by government officials or their agents that will provide the prosecution with the "equivalent of direct police interrogation." *Kuhlmann* v. *Wilson*, 477 U.S. 436, 459 (1986). Interrogation of defendants by court officers would pose the very threat to Sixth Amendment rights that *Massiah* sought to prevent. We thus agree with the judge's assessment that, for purposes of a Sixth Amendment analysis, court officer Marrin must be viewed as an agent of law enforcement.

We also agree with the judge's assessment that the defendant's

initial remarks to Marrin were not the product of any questioning or interrogation, nor of any action by Marrin to "deliberately elicit" incriminating statements from the defendant in the absence of her lawyer. Notwithstanding the protections of the Sixth Amendment, statements "spontaneously volunteered" by a defendant in the absence of counsel do not have to be suppressed. *United States* v. *Melanson*, 691 F.2d 579, 586 (1st Cir. 1981) (defendant blurted out incriminating statement while listening to codefendant's bail argument). Statements obtained "by luck or happenstance" do not implicate the Sixth Amendment. *Maine* v. *Moulton, supra* at 176. Here, when the defendant mentioned her son's experience with leg irons, Marrin asked who her son was, a casual remark made without any expectation that the son's identity would lead to the revelation of any incriminating information. The defendant's ensuing comment that she hoped her son would forgive her was made without any prompting on Marrin's part. The defendant suggests that we should imbue Marrin's immediate reaction — "Excuse me?" — as a question designed to elicit further incriminating information. However, we defer to the judge's assessment of the witnesses on this point.[11] He found that Marrin's remark was made as a "reflexive response," not designed or reasonably likely to elicit an incriminating response. An "inadvertent" remark by a law enforcement agent, that happens to lead to a defendant's making an incriminating statement, is not the equivalent of police interrogation. See *Commonwealth* v. *Bandy*, 38 Mass. App. Ct. 329, 332, 335 (1995) (probation officer's remark that charges against defendant were "real serious" did not violate Sixth Amendment). We see no error in the judge's conclusion that the defendant's statements, up through that point in the exchange with Marrin, did not need to be suppressed.[12]

Finally, we also agree with the judge's conclusion that Mar-

---

[11]Marrin was examined and cross-examined in detail with respect to the tenor and purpose of this specific remark:

[12]For the first time on appeal, the defendant argues that her statements to Marrin were not voluntarily made, suggesting that counsel was ineffective for failing to raise the voluntariness issue in the motion to suppress as originally filed and presented. We do not normally consider on appeal issues that were not fairly raised below (see *Commonwealth* v. *Garcia*, 409 Mass. 675, 678-

rin's subsequent questions to the defendant (asking her whether she had lit the fire, why she had done so, and whether she knew about the other occupants of the house) were specific questions about the crime, and that they were reasonably likely to elicit an incriminating response from the defendant. Those questions were posed in derogation of the defendant's Sixth Amendment rights, and her incriminating responses to those specific questions were properly suppressed.

3. *Conclusion.* We therefore reverse so much of the judge's order that suppressed the defendant's statements made prior to Trooper Condon's participation in the February 27, 1999, interview. In all other respects, the judge's order on the defendant's motion to suppress is affirmed. The matter is remanded for further proceedings consistent with this opinion.

*So ordered.*

.

679 [1991], and cases cited), and we see no reason to create any exception in the present case. Because the issue was not raised below, the record with respect to the defendant's mental condition at the time of arraignment (the ostensible basis for the new claim of involuntariness) was not developed by either side. While the judge made extensive findings as to the defendant's underlying mental deficits, and made specific findings as to her condition at the time of her interview at the police station, he made no findings with respect to her condition at arraignment two days later or with respect to what role (if any) her mental difficulties played in her conversation with Marrin. Nor is this a case where declining to entertain the argument on appeal will create a substantial risk of a miscarriage of justice. *Id.* at 679. The matter is here on an interlocutory appeal. On remand, the defendant may pursue the claim of involuntariness before the trial court, and may appeal in the ordinary course from any adverse decision. There is no reason for us to entertain the argument now.