COMMONWEALTH *vs.* RICHARD D. HOWARD.

Franklin. March 9, 2006. - April 18, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Constitutional Law,* Assistance of counsel, Admissions and confessions. *Practice, Criminal,* Assistance of counsel, Admissions and confessions. *Due Process of Law,* Assistance of counsel. *Evidence,* Admissions and confessions. *Department of Social Services,* Investigator. *Error, Harmless.*

This court concluded that while a judge in the Superior Court erred in denying a criminal defendant's motion to suppress an incriminating statement made by the defendant, who had an attorney, to an investigator with the Department of Social Services who interviewed him at jail without his attorney present [568-569], the admission of the evidence was harmless beyond a reasonable doubt [569-571].

INDICTMENTS found and returned in the Superior Court Department on August 9, 2002.

A pretrial motion to suppress evidence was heard by *Mary-Lou Rup,* J., and the cases were tried before *John A. Agostini,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Aziz Safar* for the defendant.

*Steven Greenbaum,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of forcible rape of a child and indecent assault and battery. His convictions were affirmed by the Appeals Court in an unpublished memorandum and order entered pursuant to its rule 1:28. *Commonwealth* v. *Howard,* 63 Mass. App. Ct. 1120 (2005). We granted the defendant's application for further appellate review on the limited issue whether a judge in the Superior Court erred in denying the defendant's motion to suppress an incriminating statement made by the defendant, who had an attorney, to an investigator with the Department of Social

Services (department) who interviewed him at jail without his attorney present. We conclude that the statement should have been suppressed, but that the admission of the evidence was harmless beyond a reasonable doubt. Accordingly, we affirm the defendant's convictions.

The Commonwealth's evidence indicated the following. In the fall of 2001, the victim, who was then fourteen years of age, and the defendant, her uncle, resided in the same house in the town of Orange. On the evening of November 5, the victim accompanied the defendant on a drive to Winchester, New Hampshire, to purchase cigarettes. On their return to Massachusetts, the defendant drove to a remote location and stopped his vehicle in a field, explaining to the victim that he "needed to go to the bathroom." There were no houses anywhere around. The victim waited in the passenger seat of the vehicle. On his return, the defendant entered the driver's side of the vehicle, reached over the center console, and lifted a lever on the side of the passenger seat that caused the victim's seat to fall backward. The defendant then climbed over the center console and on top of the victim. The defendant used one hand to hold down the victim's hands and with his other hand fondled the victim's breasts. The victim told the defendant to stop and screamed for help. The defendant ignored her screams, pulled her jogging pants and underwear down below her knees, pried apart her legs, and inserted his penis into her vagina. The victim cried out in pain. The defendant eventually withdrew his penis, spilling some ejaculate onto the victim's pants. The defendant cautioned the victim that he would kill her if she told anyone what had happened.

In February, 2002, the victim discovered that she was pregnant. She informed everyone that the baby's father was her boy friend at the time, because she was ashamed and did not want it known that her baby was an "incest baby." On July 14, 2002, the victim finally disclosed the facts of the rape to her mother and a friend, who immediately reported the rape to the Orange police. A few days later, the victim gave birth to a baby girl. Deoxyribonucleic acid (DNA) testing on blood samples taken from the victim and her daughter, and a buccal swab taken from the defendant, demonstrated that, in the Caucasian

population, it was twenty-one million times more likely that the defendant was the baby's biological father as opposed to the biological father being a randomly selected male.

The defendant contended at trial that he was living with family members in Maine in November, 2001, and that the victim had fabricated the charges against him in order to "take the heat off" of her boy friend (who, as an adult, could have been prosecuted for statutory rape). The defendant challenged the victim's testimony with respect to the sudden manner in which the defendant had lowered the back of her seat by introducing in evidence a photograph of a blue Pontiac LeMans automobile, purported to be the same vehicle driven by the defendant that night. The vehicle depicted in the photograph was equipped not with a lever but with a knob that, when turned, lowered the seat back slowly in increments. The defendant also attempted to impeach the victim with an alleged statement made to the defendant's son that any intercourse between herself and the defendant had not been forced.

1. The factual background of the motion to suppress (drawn from the motion judge's findings of fact) is as follows. On July 15, 2002, the department received a report, filed pursuant to G. L. c. 119, § 51A, alleging sexual abuse of the victim by the defendant. Two days later, a department investigator, Brenda Mozdzierz, a trooper from the Massachusetts State police detective unit, Walter Dacyczyn, and a victim witness advocate from the district attorney's office met as part of a Sexual Abuse Intervention Network (SAIN)[1] team to interview the victim. As the department investigator assigned to the victim's case,

---

[1]The Sexual Abuse Intervention Network (SAIN) was developed to avoid multiple interviews of children who may have suffered abuse. A SAIN team typically is comprised of members of several different agencies, one or more who interview the child, while the representatives of other agencies watch from behind a mirrored window. See *Commonwealth* v. *Lam*, 444 Mass. 224, 227 n.4 (2005). As indicated above, the victim's interview in this case was conducted in the presence of representatives from the Department of Social Services (department), the State police, and the district attorney's office. There was no two-way mirror. Although the Appeals Court has acknowledged that electronic recordings of SAIN interviews are "good practice," *Commonwealth* v. *Upton U.*, 59 Mass. App. Ct. 252, 255 (2003), neither the Appeals Court, nor this court, has required that such recordings be made, and none was made in this case.

Mozdzierz was responsible for investigating and evaluating whether the allegations against the defendant could be substantiated. See G. L. c. 119, § 51B. After the interview ended, Trooper Dacyczyn sent a memorandum to the department requesting that Mozdzierz refrain from making any contact with the defendant until further notice, and gave no direction to Mozdzierz with respect to his own investigation.[2] Some time thereafter, Mozdzierz became aware that the defendant was scheduled to appear in the Probate and Family Court on July 23. Mozdzierz believed that, as a member of a SAIN team, she had an obligation to report this information to the investigating police officer. Consequently, she left a message informing Trooper Dacyczyn of the defendant's court date and further advising him that she had heard that the defendant often flees from the area when he is in trouble. The defendant appeared in the Probate and Family Court on July 23 in connection with a case involving custody of his daughter. On July 24, Trooper Dacyczyn interviewed the defendant regarding the allegations and then placed him under arrest.[3]

At his arraignment in the Greenfield Division of the District Court Department the next day, the defendant was appointed counsel and ordered held in lieu of posting bail. After learning that the defendant was in custody, Mozdzierz arranged to interview him and, on July 30, met with him in a "fenced in" area at the Franklin County house of correction.[4] She advised him that she was working with the SAIN team as part of a joint investigation with the district attorney's office and handed him a department brochure. She explained the investigative process and informed the defendant that he had a right to refuse to speak with her and that he could have his attorney present. On being told that the defendant had a lawyer, Mozdzierz inquired whether he wanted his lawyer to be present at the interview and

[2]Trooper Dacyczyn was unaware that SAIN teams ordinarily undertake cooperative investigations of sexual abuse allegations and, consequently, intended to conduct his own independent investigation into the victim's allegations.

[3]The defendant, apparently, raised no issues regarding the propriety of Trooper Dacyczyn's interview.

[4]Mozdzierz did not notify the defendant's counsel or Trooper Dacyczyn of this meeting.

advised him that the interview was voluntary. She did not, however, advise him that the information he gave could be used in court proceedings. The defendant agreed to speak with Mozdzierz.

The interview lasted between forty-five minutes and one hour. From the outset of the interview, the defendant denied raping his niece. When Mozdzierz repeatedly asked the defendant whether he had ever had a sexual relationship with her, the defendant declined to answer and, finally, stated that he needed to speak with his lawyer. Mozdzierz wrote a report of her investigation, pursuant to G. L. c. 119, § 51B, including her interview with the defendant, that was forwarded to the district attorney's office.

The judge accepted Mozdzierz's testimony that she sought to interview the defendant in performance of her duties as a department investigator, but found that her questions were directed solely toward the issue of the defendant's guilt. The judge further found that, because SAIN teams conduct joint investigations of child sexual abuse allegations, Mozdzierz understood that the report would be sent to the district attorney's office, and that the report was also independently required to be sent to the district attorney's office and local law enforcement authorities, pursuant to G. L. c. 119, § 51B (4). The judge reasoned, nevertheless, that the department is not a law enforcement agency within definitions of that term appearing in the General Laws (see, e.g., G. L. c. 22A, § 1; G. L. c. 209A, § 1; G. L. c. 12, § 32 [*d*]); that nothing in the agency's statutory or regulatory framework, or in the creation of SAIN teams, indicates that department employees have any law enforcement powers; and that Mozdzierz was not under the direct supervision of Trooper Dacyczyn. The judge determined that the defendant had not demonstrated that the police " 'took some action . . . that was designed deliberately to elicit incriminating remarks,' *Kuhlmann* v. *Wilson*, 447 U.S. 436, 459 (1986), or that they 'knowing[ly] exploit[ed] . . . an opportunity to confront the [defendant] without counsel being present.' *Maine* v. *Moulton*, 474 U.S. [159, 176 (1985)]." *Commonwealth* v. *Bandy*, 38 Mass. App. Ct. 329, 334-335 (1995). Accordingly, the judge concluded that Mozdzierz's interview of the defendant did not constitute a

violation of his rights under the Sixth Amendment to the United States Constitution.[5]

The judge did not have the benefit of our decision in *Commonwealth* v. *Hilton*, 443 Mass. 597 (2005). In that case, we affirmed the partial suppression of statements made by a defendant in response to specific questions posed by a court officer on the ground that the statements were made in violation of the defendant's right to counsel under the Sixth Amendment. The Commonwealth acknowledged in the *Hilton* case that the defendant's right to counsel had attached at the time of her conversation with the court officer. See *id.* at 614. We recognized that the principle prohibiting government agents from "deliberately elicit[ing]" statements from a defendant without his lawyer present, *Massiah* v. *United States*, 377 U.S. 201, 206 (1964), "not only prohibits direct interrogation of a defendant, but more generally prohibits any 'knowing exploitation by the State of an opportunity to confront the accused without counsel being present.' " *Commonwealth* v. *Hilton, supra*, quoting *Maine* v. *Moulton, supra*. Once the Sixth Amendment right to counsel has attached, we stated, the *Massiah* and *Moulton* decisions, and others in their constitutional wake, see, e.g., *Kuhlmann* v. *Wilson*, 477 U.S. 436, 457 (1986); *Michigan* v. *Jackson*, 475 U.S. 625, 630 (1986); *United States* v. *LaBare*, 191 F.3d 60, 64 (1st Cir. 1999), make clear that governmental efforts to elicit incriminating information from an accused are prohibited and the scope of this prohibition includes questioning by a government official or an agent of such an official. See *Commonwealth* v. *Hilton, supra* at 615. We reasoned that court officers, while not police officers, are authorized to perform police duties, see G. L. c. 221, § 70A, wear a uniform and a badge, and may be required to report observations of criminal activity to a supervisor or the police. We concluded, therefore, that court officers are agents of law enforcement authorities for Sixth Amendment purposes. See *Commonwealth* v. *Hilton, supra* at 616, 617. We went on to say that, leaving the law enforce-

---

[5]The judge in her memorandum of decision also rejected the defendant's claim that he had been denied his right to counsel under art 12 of the Massachusetts Declaration of Rights. On appeal, the defendant raises only his Sixth Amendment right.

ment analysis aside, court officers are required, as part of their usual employment duties, to interact with defendants without counsel present, and "by virtue of their presence in the court room during ongoing proceedings, court officers regularly become aware . . . of the nature of the pending charges and the specific evidence against a defendant. The right to the assistance of counsel would be seriously 'dilute[d],' [*Maine* v. *Moulton, supra* at 171,] if court officers could, on their own initiative, question defendants about their pending cases and then turn a defendant's incriminating responses over to the police and prosecutor." *Commonwealth* v. *Hilton, supra* at 617.

What was said in our *Hilton* decision is dispositive here, a conclusion that the Commonwealth does not strenuously contest. Although the court officer in the *Hilton* case was deemed to be an agent of law enforcement, our holding did not rest on that particular fact pattern. See *id.* at 614-615. Our primary concern was, and remains, with the constitutional implications of questioning on matters concerning pending charges posed by persons whose official duties direct them to interact with a defendant and who may be required to turn any incriminating responses over to the police and prosecutor. "The command of *Massiah* and its progeny is that we not tolerate interrogation practices by government officials or their agents that will provide the prosecution with the 'equivalent of direct police interrogation.' " *Id.* at 617, quoting *Kuhlmann* v. *Wilson, supra* at 459. A department investigator is a government official, and there can be no question that Mozdzierz's interview of the defendant, even though conducted in furtherance of her responsibilities for the care and protection of children, was prohibited governmental interrogation and constituted the equivalent of direct police interrogation. The admission of her testimony was, therefore, error.

2. We now inquire whether the error in the denial of the defendant's motion to suppress and in the admission of the testimony of the department investigator requires a new trial. We reject the defendant's contention that the error was presumptively prejudicial and, as such, mandates reversal. The United States Supreme Court has explained that a violation of a defendant's right to counsel under the Sixth Amendment to the

United States Constitution requires reversal only in "cases in which the deprivation of the right to counsel affected — and contaminated — the entire criminal proceeding." *Satterwhite* v. *Texas*, 486 U.S. 249, 257 (1988). Where the error "caused by [the] Sixth Amendment violation is limited to the erroneous admission of particular evidence at trial," as is the case here, the harmless error analysis applies. *Id.* See *Commonwealth* v. *Vao Sok*, 435 Mass. 743, 753 (2002); *Commonwealth* v. *Perez*, 411 Mass. 249, 259-260 (1991); *Commonwealth* v. *Donovan*, 392 Mass. 647, 651 (1984).[6] Under that analysis "[t]he admission of testimony obtained in violation of [the] defendant's [right to counsel] will not amount to reversible error 'if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' *Commonwealth* v. *Miles*, 420 Mass. 67, 73 (1995), quoting *Delaware* v. *Van Arsdall*, 475 U.S. 673, 681 (1986). To make that determination, we examine a number of factors, including the importance of the evidence in the prosecution's case, the frequency of reference to the evidence, whether it was cumulative of other evidence and whether the other evidence against the defendant was overwhelming. *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 509 n.11 (1992); *Commonwealth* v.

---

[6]The defendant's argument that *Commonwealth* v. *Manning*, 373 Mass. 438, 443 (1979), governs here is misplaced. In that case, Federal law enforcement officials intentionally made disparaging statements to the defendant about his counsel in "a calculated attempt to coerce the defendant into abandoning his defense." *Id.* The *Manning* decision makes plain that the Sixth Amendment violation was of such an egregious nature that automatic reversal was required. See *id.* at 441, 443. The court did not, however, adopt an automatic reversal rule as the decisions cited in the text confirm.

Here, the violation of the defendant's right to counsel did not reach the level of the very serious violation that occurred in the *Manning* case. Nothing in the judge's findings, or in testimony presented during the hearing on the defendant's motion to suppress, raises an inference that Mozdzierz deliberately subverted the defendant's right to counsel. Indeed, the record shows that the interview commenced with her suggestion that the defendant could have his counsel present. Nor was there evidence that Mozdzierz pressured the defendant to talk to her, directly or indirectly, by using his pending case in the Probate and Family Court, in which the department was involved, as leverage to obtain information she sought. Of course, based on our decision that department investigators are not permitted to engage in these types of interviews in the future, without counsel present, any problem of improper "pressure" by department officials will not arise.

*Sinnott,* 399 Mass. 863, 872 n.8 (1987)." *Commonwealth* v. *Rosario,* 430 Mass. 505, 511 (1999).

Examination of the record of the entire trial satisfies us that the error could not have influenced the jury's verdict. In addition to the victim's own testimony describing the rape, the Commonwealth introduced DNA evidence that virtually mandated the conclusion that the defendant was the father of the victim's child. In his defense, the defendant offered testimony that the defendant was in Maine in November of 2001; that the vehicle he drove on November 5, 2001, had a knob that required turning for the seat to fall back slowly; that the victim had stated that her boy friend was the father of her child; and that her boy friend had told a cellmate the same. To shore up his claim that the victim's account of rape was not to be believed, the defendant offered testimony of his son that the victim had told him no force was involved. The jury obviously believed the victim's testimony that a forcible assault took place. The only material evidence adduced from Mozdzierz's improper questioning, offered by the Commonwealth in rebuttal, was the defendant's admission that his last contact with the victim had been eight to nine months earlier, an estimate consistent with a period of time when the victim was impregnated. We conclude that the error in admitting Mozdzierz's testimony was harmless beyond a reasonable doubt.

3. The order denying the defendant's motion to suppress is reversed, and an order is to enter allowing the motion. The judgments of conviction are affirmed.

*So ordered.*