Filed 2/6/25  P. v. Swenson CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>HEATHER BRIANA SWENSON,<br><br>    Defendant and Appellant. | G063237<br><br>(Super. Ct. No. 22CF1292)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Richard J. Oberholzer, Judge. Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Elana W. Miller, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted Heather Briana Swenson of robbery, vehicle theft, elder abuse, and simple assault. She admitted a prior strike and a prior serious felony conviction. The trial court suspended the execution of a six-year prison sentence, and granted Swenson formal probation.

Swenson claims the trial court erred when it denied her pretrial motion to dismiss the case on the basis that the police knowingly destroyed exculpatory evidence.[1] (See *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*); *Arizona v. Youngblood* (1988) 488 U.S. 51 (*Youngblood*).)

Swenson also claims the trial court erred when it denied her pretrial motion to exclude her statements to the police on the basis that her *Miranda* waiver was not knowing, intelligent, or voluntary. (See *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).)

We find no errors and affirm the judgment of the trial court.

I.

FACTS AND PROCEDURAL BACKGROUND

On May 25, 2022, at around 4:30 p.m., Swenson told her friend Alex R. (Alex) that she was not feeling well, so it was determined that Alex would drive her to the hospital. Alex was about 87 years old; Swenson was about 42 years old. Alex left his home in Santa Ana and began to drive Swenson towards a nearby hospital in his white rental car. Swenson took over driving when Alex made a U-turn and drove "too close to the curb."

Instead of driving to the hospital, Swenson drove Alex around "senselessly" for about 12 hours, and "never attempted to go to a hospital or anything like that." At one point during the evening, she removed Alex's

---

[1] Hereinafter, referred to as a *Trombetta*/*Youngblood* motion.

glasses from his face, broke them, and threw them out of the window. At another point, Swenson hit Alex in the nose and kicked him "on the left side of the face." Swenson also put her hands around Alex's throat and asked him if he wanted to die. Swenson got out of the car and went into a home at one point during the evening. Alex was able to get behind the wheel of the car to drive away, but then Alex realized Swenson had taken the car's fob key.

At about 4:00 a.m., Swenson stopped the car at a Motel-6 in Riverside County. Swenson gave Alex a $100 bill and told him to get a room. The motel would not let Alex have a room because he had blood on his face. Alex tried to return to his car in the motel's parking lot, but he realized Swenson "took the car and stole the car at that moment." Alex borrowed a cell phone from a maintenance worker and called 911.

*Police Investigation*

On May 26, 2022, at about 8:00 a.m., a Hemet police officer spoke to Alex, who was sitting on a bench. The officer said Alex appeared as though "he had been in a pretty bad fight, he was bleeding, well, [he had] dried blood, bruising, scratches, and I noticed he urinated his pants." Alex was carrying a $100 bill, and he had blood "all over his visible body, face, arms." The officer said Alex appeared "a little bit confused."

On May 27, 2022, at about 7:00 a.m., a Laguna Beach police officer conducted a welfare check of a white car without any license plates, which was parked on the shoulder of a road. The officer saw a female passenger (Swenson) and a male driver in the car. Swenson said there was a man in the trunk, possibly with a gun. Police did not find anyone in the trunk, nor did they find any weapons in the car.

On May 31, 2022, Santa Ana Police Detective Amanda Miller

3

interviewed Swenson at the Orange County Jail. Miller first advised Swenson of her *Miranda* rights (this subject will be covered in more detail in the discussion section of this opinion). Miller asked Swenson about the May 25, 2022, incident. Swenson said she drove Alex on the night in question because, "She seemed to believe that they - - her and Alex were being chased by some people." Swenson told Miller that she eventually drove Alex to Hemet and gave him a $100 bill. When asked about Alex's injuries, Swenson initially denied causing his injuries, but later said "that if it was her," she did it because "she needed to get him in the passenger seat."

On June 2, 2022, Detective Miller returned to the jail to see if Alex's cell phone had been booked into Swenson's property. After locating and obtaining Alex's phone, Miller looked through it "to try to see messages, photos, anything that can help as evidence in the case." However, Miller discovered that the phone's SIM card was missing (this subject will be covered in more detail in the discussion section of this opinion).

*Court Proceedings*

The People filed an amended information charging Swenson with kidnapping, robbery, assault with force likely to cause great bodily injury (aggravated assault), elder abuse, and vehicle taking. The People also alleged Swenson had a prior strike conviction and prior serious felony conviction.

During the jury trial, as part of her defense, Swenson testified on her own behalf. Swenson said that in the days preceding May 25, 2022, she had been driving Alex's rental car because her vehicle had been stolen. She admitted driving Alex on the night in question, and dropping him off at the Hemet hotel; however, Swenson denied ever kicking Alex, or putting her hands around his throat.

4

The jury found Swenson not guilty of kidnapping and aggravated assault. The jury found Swenson guilty of robbery, simple assault (as a lesser included offense), elder abuse, and vehicle taking. The court stayed a six-year prison sentence and placed Swenson on two years of formal probation.

## II.
## DISCUSSION

Swenson claims the trial court: (A) erred when it denied her motion to dismiss the case; and (B) erred when it denied her motion to exclude statements she made to the police. We shall analyze each claim.

### A. The Trombetta/Youngblood Motion

Swenson claims the trial court erred when it denied her *Trombetta*/*Youngblood* motion to dismiss the case on the basis that the police knowingly destroyed exculpatory evidence. We disagree.

"We review the trial court's decision on a *Trombetta/Youngblood* motion under the substantial evidence standard." (*People v. Alvarez* (2014) 229 Cal.App.4th 761, 774.) That is, we review the whole record in the light most favorable to the judgment and we do not reweigh the evidence. (*Ibid.*) "'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact.'" (*People v. Lagunas* (2023) 97 Cal.App.5th 996, 1007.)

In this part of the discussion, we shall: 1) review principles of law regarding *Trombetta/Youngblood* motions; 2) summarize the trial court proceedings; and 3) analyze the facts as applied to the laws.

5

### 1. Relevant Principles of Law

Generally, under the Fourteenth Amendment's due process clause, law enforcement agencies have a duty to preserve evidence "that might be expected to play a significant role in the suspect's defense." (*Trombetta, supra,* 467 U.S. at p. 488.) To fall within the scope of this duty, the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Id.* at p. 489.)

A law enforcement agency's responsibility is narrower when the defendant's challenge is based on the failure to preserve *potentially* exculpatory evidence—that is, "evidentiary material of which no more can be said than that *it could have been subjected to tests,* the result of which *might* have exonerated the defendant." (*Youngblood, supra,* 488 U.S. at p. 57, italics added.) "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve *potentially* useful evidence does not constitute a denial of due process of law." (*Id.* at p. 58, italics added.)

"The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." (*Youngblood, supra,* 488 U.S. at pp. 56–57, fn. *.) It is significant whether the law enforcement agency knew the evidence could form a basis for exonerating the defendant and failed to preserve it as part of a conscious effort to circumvent its constitutional discovery obligation. (*Trombetta, supra,* 467 U.S. at p. 488.) The negligent destruction of, or failure to preserve, potentially exculpatory evidence, without evidence of bad faith, will not give rise to a due process violation. (*Youngblood, supra,* 488 U.S. at p. 58.)

### 2. Trial Court Proceedings

Before trial, Swenson filed a written *Trombetta/Youngblood* motion. She alleged that by returning Alex's cell phone to him, "Detective Miller and the Santa Ana Police Department have summarily denied Ms. Swenson the right to present favorable and material evidence that would play a significant role in her defense."

Outside the presence of the jury, the court conducted a hearing on the motion. Swenson called Detective Miller to testify. On direct examination by Swenson's counsel, Miller said that she was not aware that there were any recordings on Alex's cell phone, nor did she remember Swenson ever asking her to preserve any recordings on the phone. Miller did not book Alex's phone into evidence, but rather she returned it to him. Miller did not extract ("dump") any data from the cell phone. On cross-examination by the prosecutor, Miller testified that Alex's phone was missing a SIM card, which "contains all the data that's stored on the phone."

After the close of evidence, Swenson's counsel argued, "Swenson notified not only Detective Miller but other law enforcement that there were recordings on the cell phone." Counsel said, "I find it odd that this detective never even booked that [phone] into evidence, never took the extra step to have the phone dumped." The prosecutor argued, "Detective Miller testified that she does not recall or remember the defendant telling her anything about anything on the phone relating to the case. The phone was examined by Detective Miller. She testified there was no SIM card, no data in the phone, believed that it didn't have anything -- any relation to this case and returned it to the owner."

The trial court ruled on the motion: "The Court notes the phone was not -- was not the property of the defendant and it was returned to the

7

owner of that particular device. The owner allowed the officer to go through the phone. The officer didn't find anything. But it was the owner's property; it was not the defendant's property. I equate that to, in a sense, when a person steals a vehicle, the vehicle is usually given back to the owner even though the person hasn't been prosecuted at that time. Evidence can be gathered from the vehicle if necessary."

The trial court concluded: "In this particular case, the officer testified that the SIM card was missing from the phone. I think all of us have a general understanding of how cell phones operate, and you have to have a SIM card in order to have [to] be able to store memory. [¶] Anyway, final conclusion of the Court is that [the] motion is denied."

### 3. Application and Analysis

Swenson presented no evidence to support a determination that there was any exculpatory evidence on Alex's phone or that it "might be expected to play a significant role in the suspect's defense." (See *Trombetta, supra,* 467 U.S. at p. 488.) Further, given the absence of the SIM card on the cell phone, there was evidence to support the court's implicit finding that Detective Miller did not act in bad faith by simply returning the cell phone back to its owner. (See *Youngblood, supra,* 488 U.S. at p. 58.)

In sum, we find the trial court's denial of Swenson's motion to dismiss is supported by substantial evidence. There is no indication that Detective Miller knowingly (or even inadvertently) destroyed exculpatory evidence. Thus, we affirm the lower court's ruling.

Swenson argues that during the trial she testified that Detective Miller told her that Alex's phone would be kept "at the police station, that my attorney would have access to it and all the recordings on it." However,

8

Swenson did not take the stand and testify until *after* the trial court had made its *Trombetta/Youngblood* ruling, so her trial testimony does not affect our analysis. (See *People v. Welch* (1999) 20 Cal.4th 701, 739 ["We review the correctness of the trial court's ruling at the time it was made . . . and not by reference to evidence produced at a later date"].)

In this appeal, Swenson is essentially arguing that Detective Miller's testimony is not to be believed. But it is not the role of this court in a substantial evidence review to question the credibility of witnesses. (See *People v. Davis* (2024) 107 Cal.App.5th 500, 509 ["our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings"].)

To reiterate and conclude as to Swenson's first claim, we affirm the trial court's denial of her *Trombetta/Youngblood* motion.

*B. The Motion to Exclude Statements to the Police*

Swenson claims the trial court erred when it denied her motion to exclude statements she made to the police on the basis that they were obtained in violation of her constitutional *Miranda* rights. We disagree.

In reviewing a defendant's claim of an invalid waiver of his or her *Miranda* rights, "we apply an independent standard of review, doing so 'in light of the record in its entirety, including "all the surrounding circumstances—both the characteristics of the accused and the details of the [encounter]."'" (*People v. Neal* (2003) 31 Cal.4th 63, 80.)

In this part of the discussion, we shall: 1) review relevant principles of law regarding *Miranda* waivers; 2) summarize the trial court proceedings; and 3) analyze the facts as applied to the relevant laws.

*1. Relevant Principles of Law*

"No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." (U.S. Const., 5th Amend.) When the police take a suspect into custody and interrogate that person, the Supreme Court has held that such a situation is inherently compelling; therefore, any statements to the police during a custodial interrogation are presumed to be compelled, and are generally inadmissible during the prosecution's case-in-chief. (*Miranda*, *supra*, 384 U.S. at pp. 498–499.)

However, if the prosecution proves by a preponderance of the evidence that the police advised the defendant of his constitutional rights, and the defendant knowingly, intelligently, and voluntarily waived those rights, then the presumption is overcome, and the defendant's statements are then admissible. (*People v. Nelson* (2012) 53 Cal.4th 367, 374–375.)

"Although there is a threshold presumption against finding a waiver of *Miranda* rights [citation], ultimately the question becomes whether the *Miranda* waiver was knowing and intelligent under the totality of the circumstances surrounding the interrogation." (*People v. Cruz* (2008) 44 Cal.4th 636, 668.) The relinquishment of *Miranda* rights also needs to have been made voluntarily—it was the product of a free and deliberate choice rather than intimidation, coercion, and deception—and it must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. (*People v. Whitson* (1998) 17 Cal.4th 229, 247; see *Cruz*, at p. 669, ["The test for determining whether a confession is voluntary is whether the questioned suspect's 'will was overborne at the time he confessed'"].)

"'Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and

10

request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.'" (*People v. Whitson, supra,* 17 Cal.4th at p. 247.)

### 2. Trial Court Proceedings

Before trial, Swenson filed a written motion seeking to exclude her statements to the police. Swenson argued that "Detective Miller noted in her report that 'It appeared to me during the interview, that Swenson was displaying signs of mental illness. Swenson's statements were extremely unorganized and indicative of paranoia.' Given this was Detective Miller's observation of Ms. Swenson during [the] interrogation of her in the Orange County Jail, she is acknowledging Ms. Swenson's inability to comprehend the seriousness of her predicament. Therefore, given the totality of the circumstances here, it is clear that Ms. Swenson's will to resist was destroyed, and her statements were involuntary."

Outside the presence of the jury, the court conducted a hearing on Swenson's motion to exclude her statements to the police.

On direct examination by the prosecutor, Detective Miller testified that she spoke with Swenson at the Orange County Jail while she was with another detective. She said that it is her practice to read a *Miranda* advisement when speaking with a suspect and that is what she did in this case. Miller said, "I spoke with her through . . . a partition, a glass partition, through a phone. And I was able to read her her *Miranda* rights, and she indicated, yes, that she understood each question I read her." Miller then recited the standard *Miranda* advisement using a card that she carries with her. Miller testified Swenson "said yes to each question."

Detective Miller testified that her belief at the time of the

11

*Miranda* advisement was that Swenson understood her rights. Miller said that she made no promises of leniency, she did not have her gun drawn, and she did not threaten Swenson with any force, nor did she use any actual force when she spoke to Swenson. Miller testified that at no point did Swenson ever go silent or indicate that she did not wish to speak any further.

On cross-examination by Swenson's counsel, Detective Miller testified she did not speak to the victim (Alex) before speaking with Swenson. Miller said that before the interview with Swenson she had spoken to the responding officer and she "reviewed the initial report." Miller said she did not have her body-worn camera with her because she intended to record the interview with a digital recorder.[2] Miller testified that at no point did she tell Swenson that she could leave the interview if she wanted to.

Detective Miller testified that when she spoke with Swenson there were a few crimes she considered that might eventually be charged: kidnapping, robbery, elder abuse, and vehicle theft. Miller confirmed that she had written in her report that Swenson's statements were extremely unorganized. Miller testified that during the interview she asked Swenson if she had a mental illness, and Swenson said that she did not. Nonetheless, Miller still suspected Swenson had a mental illness.

After the close of evidence, Swenson's counsel argued that Detective Miller "noted that there was unorganized thought process, there was a suspicion of mental illness, and so, in terms of making an informed and knowing waiver, it's the defense's position that Ms. Swenson did not make such a waiver." Counsel argued that although Miller "is not a trained psych

---

[2] The digital recording and/or transcription of Detective Miller's interview of Swenson at the jail is not part of the record on appeal.

professional," she "question[ed] the state of mind of Ms. Swenson. And she specifically noted [Swenson was] unorganized, which means [an] illogical thought process. I think that's enough to establish that Ms. Swenson was -- that there was not a knowing and voluntary waiver."

The trial court ruled on the motion by speaking to Swenson's counsel: "[T]he law doesn't require a police officer to have a psychiatrist or psychologist accompany them when they make -- perform a *Miranda* interview -- or give a *Miranda* warning, excuse me. [¶] And the fact that a person has unorganized thoughts I don't think is indicative that a person is mentally ill in any way or can't participate. If you're making a motion to suppress any statements made by the defendant pursuant to a lack of appropriately given *Miranda* rights, that motion's denied."

### 3. Application and Analysis

In this case, we apply our own independent judgment, but we largely agree with the trial court's analysis. That is, Detective Miller's assessment that Swenson was disorganized in her thoughts, or may have been mentally ill, does not necessarily equate to a finding that she was unable to knowingly, intelligently, and voluntarily waive her *Miranda* rights.

Indeed, a wide spectrum of case law confirms that evidence of mental illness does <u>not</u> by itself establish the invalidity of a *Miranda* waiver. (See *Colorado v. Connelly* (1986) 479 U.S. 157, 164 ["a defendant's mental condition, by itself and apart from its relation to official coercion, should [never] dispose of the inquiry into constitutional 'voluntariness'"]; *People v. Watson* (1977) 75 Cal.App.3d 384, 396–398 [*Miranda* waiver was knowing and intelligent, notwithstanding defendant's claim he had schizophrenia, brain damage, and low I.Q.]; *Daoud v. Davis* (6th Cir. 2010) 618 F.3d 525,

13

528–531 [*Miranda* waiver was knowing and intelligent despite evidence defendant had mental illness]; *United States v. Robinson* (4th Cir. 2005) 404 F.3d 850, 861 ["Although [defendant] admittedly has a low I.Q. and several mental disorders, nothing in the record indicates that [he] could not understand the rights as [law enforcement] provided them"]; *Smith v. Mullin* (10th Cir. 2004) 379 F.3d 919, 932–934 [*Miranda* waiver was knowing and voluntary even though defendant had mental illness]; *United States v. Turner* (8th Cir. 1998) 157 F.3d 552, 555 [rejecting defendant's claim "his waiver was not knowing and intelligent because he was impaired by a low I.Q., PCP intoxication, and mental illness"]; *United States v. Crook* (3d Cir. 1974) 502 F.2d 1378, 1381 [defendant with "chronic schizophrenia" knowingly and intelligently waived *Miranda* rights].)

Here, there was no evidence that Swenson had any form of mental illness (or any physical condition), that may have precluded her from understanding her legal rights under *Miranda*. Nor is there anything in the record before us to suggest that Swenson was in any manner impaired in her ability to comprehend and respond to Detective Miller's questions regarding the waiver of her legal rights under *Miranda*.

Further, as far as whether Swenson's *Miranda* waiver was voluntary or not, there is nothing in the record to establish or suggest that Detective Miller engaged in any form of coercion to secure the waiver of Swenson's *Miranda* rights. That is, there was no evidence that Miller engaged in any intimidating tactics designed to overcome Swenson's free will. (See *People v. Cunningham* (2015) 61 Cal.4th 609, 642 ["The test for the voluntariness of a custodial statement is whether the statement is "'the product of an essentially free and unconstrained choice'" or whether the defendant's "'will has been overborne and his capacity for self-determination

14

critically impaired'" by coercion"].)

In sum, when we consider all the surrounding circumstances based on the record before us, we find that Swenson gave a knowing, intelligent, and voluntary waiver of her *Miranda* rights. Thus, we affirm the trial court's denial of her motion to exclude her statements to the police.

Swenson argues that the case of *Commonwealth v. Hilton* (2005) 823 N.E.2d 383 (*Hilton*), compels a different result. We disagree.

In *Hilton*, defendant was charged with five murders and related arson crimes. (*Hilton*, *supra*, 823 N.E.2d at p. 387.) The defendant moved to suppress her confession "on the ground that the Commonwealth had failed to prove that the defendant's waiver of her *Miranda* rights was knowing, intelligent, and voluntary." (*Id*. at p. 388.) The defendant introduced expert testimony at an evidentiary hearing "concerning the defendant's significant mental impairments." (*Id*. at p. 390.) More than one expert testified "that the defendant is mildly mentally retarded, functionally illiterate, and given to 'delusional and bizarre thinking.' She has 'a tenuous connection to reality, poor judgment, and a tendency to misinterpret events and their meaning,' with 'little ability to understand abstract concepts.'" (*Ibid*.)

Following the hearing, "the judge concluded that the defendant's mental illness and impairments were such that the Commonwealth had not met its burden of proving that the defendant 'understood her legal rights and knowingly and intelligently waived them.' He simultaneously concluded that the defendant's statement to the police was made voluntarily in the sense that it was not coerced by either the police or by the effects of her mental illness. However, because of the judge's conclusion that the defendant's waiver of *Miranda* rights was not 'knowing and intelligent,' he decided that the resulting statement was not the product of a 'rational intellect' and

15

therefore not voluntary. He thus suppressed the entirety of the defendant's statement to the police." (*Hilton, supra,* 823 N.E.2d at p. 391.)

On appeal, the state argued "that the mere existence of mental impairments does not automatically preclude a knowing and intelligent waiver of rights." (*Hilton, supra,* 823 N.E.2d at p. 392.) The appellate court agreed this was a correct statement of the law, but found the trial court correctly applied that precedent when making its ruling: "The judge understood that the defendant's mental illness was not necessarily determinative, citing in his opinion the same precedent that the Commonwealth cites in its brief. Nothing in the judge's opinion suggests that he erroneously treated the defendant's mental illness as automatically conclusive of the invalidity of her waiver." (*Ibid.*) "We see no error in the judge's finding that the defendant's mental infirmities were such that she did not understand the *Miranda* warnings, and we therefore conclude that statements . . . were properly suppressed." (*Id.* at p. 388.)

Unlike the defendant in *Hilton,* Swenson presented no evidence that she suffered from any form of mental illness that impaired her ability to know and understand her constitutional rights under *Miranda.* Detective Miller testified Swenson appeared to exhibit disorganized thinking, and Miller suspected Swenson may have suffered from some undefined mental illness. However, Swenson told Miller during the interview that she did not have a mental illness. And Miller further testified that despite her suspicions regarding Swenson's possible mental illness, it was still her belief at the time of the *Miranda* advisement that Swenson understood her rights.

To reiterate and conclude as to Swenson's second claim, we affirm the trial court's denial of her motion to suppress her statements to the police.

16

## III.

## DISPOSITION

The judgment is affirmed.


MOORE, ACTING P. J.

WE CONCUR:


GOETHALS, J.


DELANEY, J.